**WOLTER CONSTRUCTION COMPANY, INC., Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

**No. 77–1677.**

United States Court of Appeals, Sixth Circuit.

Argued Nov. 29, 1979.

Decided Nov. 17, 1980.

Charles F. Hartsock, James W. Halloran, James J. Cunningham, Cincinnati, Ohio, for petitioner–appellant.

M. Carr Ferguson, Asst. Atty. Gen., Jonathan S. Cohen, John G. Manning, Tax Div., U. S. Dept. of Justice, Washington, D. C., Gilbert E. Andrews, Stuart E. Seigel, Chief Counsel, Internal Revenue Service, Washington, D. C., for respondent–appellee.

Before CELEBREZZE, ENGEL and BOYCE F. MARTIN, Jr., Circuit Judges.

CELEBREZZE, Circuit Judge.

The question in this case is whether deductions claimed on a consolidated income tax return filed by a parent corporation and its controlled subsidiary corporation, with respect to net operating losses sustained by the subsidiary in years prior to its affiliation with the parent, are allowable as net operating loss carryovers when the subsidiary had no post–consolidation income for the tax years in question.

## I.

Wolter Construction Company, Inc. (taxpayer) appeals from a decision of the United States Tax Court that determined deficiencies in its income tax for the years 1970 and 1971 in the respective amounts of $3,630.01 and $45,238.31. The decision of the Tax Court was entered on June 27, 1977, pursuant to an opinion filed on April 20, 1977, and is reported at 68 T.C. 39 (1977). Jurisdiction is conferred upon this court by Section 7482 of the Internal Revenue Code of 1954 (26 U.S.C.).

The material facts, as found by the Tax Court pursuant to a stipulation between the parties and as otherwise reflected on the record, are as follows:

Wolter Construction, a corporation engaged in a general contracting business, was organized on July 12, 1968. From July 15, 1968 through 1970 and 1971, the taxable years in question, its issued and outstanding stock consisted of 250 shares of common stock. Brent F. Peacher owned 200 of these shares, and Theodore T. Finneseth, Mr. Peacher's brother–in–law, owned the remaining 50 shares.

River Hills Golf Club, Inc. (River Hills), a corporation engaged in the business of operating a golf course located in California, Kentucky, was organized on September 5, 1968. From September 20, 1968, until October 23, 1969, River Hills' issued and outstanding stock consisted of 587 shares of common stock and 226 shares of preferred stock. Mr. Peacher and Mr. Finneseth each held 270 shares of common stock. The remaining 47 common shares were owned by

Luella Peacher, Mr. Peacher's mother and Mr. Finneseth's mother–in–law. Luella Peacher also owned all 226 shares of River Hills' preferred stock, which was nonvoting and limited and preferred as to dividends.

On October 24, 1969, Mr. Peacher and Mr. Finneseth each transferred 20 shares of their common stock in River Hills to Clifford H. Lahner, who was unrelated by blood or marriage to any of the other 'River Hills stockholders. On the same date, River Hills issued 360 shares of its Treasury common stock to taxpayer in consideration of taxpayer's cancellation of $18,000 in obligations owed by River Hills to Wolter for construction work performed by the latter. As a result of this transaction, the number of River Hills' issued and outstanding common shares rose to 947, of which taxpayer's 360 shares constituted 38.02 percent.

Not quite five months later, on March 2, 1970, River Hills issued an additional 1,988 shares of Treasury common stock to taxpayer. This was done in consideration of taxpayer's cancellation of another $90,000 owed by River Hills to Wolter for construction work performed by the latter and taxpayer's cancellation of $27,400 in promissory notes given by River Hills to Wolter for sums advanced by the latter. As a result of the March 2 transaction, taxpayer increased the total number of River Hills' common shares held by it to 2,348 or 80 percent of the 2,935 shares issued and outstanding.

Having become an affiliated group under Section 1504(a) of the Internal Revenue Code of 1954 by virtue of taxpayer's acquisition of 80 percent of River Hills' common stock, taxpayer and River Hills filed consolidated income tax returns for 1970 and 1971, as they were permitted to do under Section 1501 of the Internal Revenue Code. On these returns deductions totaling $125,255.43 were claimed for net operating losses reported by River Hills on its separate income tax returns for 1968, 1969, and the short taxable year January 1, through March 31, 1970. After an audit, the Commissioner of Internal Revenue determined that the carryover of River Hills' net operating losses for the periods prior to the time that it and taxpayer became affiliated was limited to the income produced by River Hills during the consolidated return years in question. Since River Hills had no income in these years, the Commissioner disallowed in full the net operating loss deductions claimed on the consolidated returns.

Taxpayer subsequently petitioned the Tax Court for a redetermination of the resulting deficiency assessed by the Commissioner. Following the filing of a stipulation of facts between the parties, the case was submitted to the Tax Court without trial. In its opinion the Tax Court held that the net operating losses incurred by River Hills prior to its affiliation with taxpayer were not deductible on the consolidated returns filed by taxpayer and River Hills for 1970 and 1971, and its decision sustained the deficiencies asserted by the Commissioner, as adjusted to reflect concessions by the parties. From this decision taxpayer now appeals.

II.

Section 1501 of the Internal Revenue Code (Code) allows an "affiliated group" of corporations to file a consolidated income tax return for a taxable year instead of filing separate income tax returns.[1] An "affiliated group" of corporations, as

1. The opportunity to file a consolidated return is available only to an affiliated group of eligible corporations. Under section 1501 the privilege of filing a consolidated return is predicated on the members consenting to the consolidated return regulations. An affiliated group which files a return in accordance with the provisions of section 1501, however, consents only to valid regulations. *Orgill Brothers & Company v. United States*, 508 F.2d 1219, 1221 (6th Cir. 1975).

The following are the major advantages usually associated with filing a consolidated return: 1) deferral of gain on intercompany transactions; 2) offsetting gains and losses; 3) tax–free intercompany dividends; 4) greater utilization of NOL and capital loss carryovers; 5) greater utilization of unused investment credits; 6) greater utilization of excess charitable contribution deductions; 7) reduction in gain on sale of a subsidiary; 8) minimizing the minimum tax. Gans, *A Practical Guide to Consolidated Returns*, 101–02 (1976).

defined in Section 1504(a) of the Code, consists of a common parent corporation and one or more other corporations. Each corporation in the "affiliated group," except the common parent, must be 80 percent directly owned by another corporation in the group.[2] The common parent corporation must directly own a minimum of 80 percent of at least one of the other corporations in the group. On March 2, 1970, Wolter and River Hills became an affiliated group eligible to file a consolidated return by virtue of Wolter's acquisition of 80 percent of the common stock of River Hills.[3] I.R.C. Sec. 1501.

The calculus for computing the consolidated income for an affiliated group and the corresponding income tax is not spelled out within the Code. Rather, Congress in § 1502 of the Code has authorized the Secretary of the Treasury to promulgate regulations that outline the requisites for and effects of filing a consolidated income tax return:

### SEC. 1502 REGULATIONS

The Secretary shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

Pursuant to this delegation the Secretary has issued extensive legislative regulations, and the bulk of the "law" dealing with consolidated returns is contained in those regulatory provisions.

Reg. 1.1502–21(b)(1) is concerned with the use of net operating losses on a consolidated return.[4] That regulation permits an affiliated group to use net operating losses sustained by any members of the group in "separate return years" if the losses could be carried over pursuant to the general principles of § 172 of the Code.[5] A "separate return year" is defined as any year in which a company filed a separate return or in which it joined in the filing of a consolidated return by another group. Reg. 1.1502–1(e).

As a general rule, then, net operating losses reported on a separate return can be carried over to and used on a consolidated return. An important exception to this rule is found in Reg. 1.1502–21(c). That section provides that the net operating loss of a member of an affiliated group arising in a "separate return *limitation* year" which may be included in the consolidated net operating loss deduction of the group shall not exceed the amount of consolidated taxable income contributed by the loss–sustain-

---

2. Direct ownership entails ownership of at least 80 percent of the voting power of the owned corporation's voting stock, and at least 80 percent of each class of nonvoting stock. The term "stock" as used in § 1504(a) does not encompass nonvoting stock which is limited and preferred as to dividends.

3. River Hills' other outstanding class of stock was nonvoting preferred stock which was limited and preferred as to dividends. Since this was not "stock" within the definition of § 1504(a), it was not necessary for Wolter to directly own 80 percent of this preferred stock to qualify for affiliated group status.

4. The regulations define the net operating loss deduction as the aggregate of the consolidated net operating loss carryovers and carrybacks to the taxable year. The consolidated net operating loss carryovers and carrybacks are, in turn, defined as the consolidated net operating losses of the group, plus any net operating losses sustained by members of the group in separate return years that may be carried over or back to the taxable year.

5. Section 172 sets forth the mechanics for computation of a net operating loss (an excess of deductions attributable to a taxpayer's trade or business over gross income) and the provisions for allowance of a net operating loss deduction. As a general rule, if losses exceed income for a taxable year beginning after 1975, the unused loss can offset income for the three preceding years. And, if the losses still exceed the income for those three years, the balance can be carried forward for the seven years following the taxable year, until the loss is used up. Net operating losses sustained in years prior to 1976 are subject to a three–year carryback and a five–year carryover.

ing member for the taxable year at issue. The term "separate return limitation year" is defined in Reg. 1.1502–1(f),[6] in essence, as a separate return year in which the member of the group (except, with qualifications, the common parent) was either: 1) not a member of the group for its entire taxable year; or 2) a member of the group for its entire taxable year, that enjoyed the benefits of multiple surtax exemptions. In summary, losses incurred by a brother or sister corporation[7] or by a corporation which is unrelated at the time of its losses to its subsequent affiliates, before it becomes a member of an affiliated group filing a consolidated return, can only be carried forward and used on the consolidated return to the extent that the corporation that incurred the losses has current income reflected on the consolidated return.

Prior to River Hills' becoming part of an affiliated group by virtue of Wolter's procurement of 80 percent of its stock, (that is, during River Hills' separate return years 1968, 1969, short year 1970) River Hills had incurred $125,255.43 in net operating losses. If, during the consolidated return years River Hills had had net income of $125,-255.43 to report on the consolidated return, it could have used its earlier losses–incurred before becoming a member of the affiliated group–as a "consolidated net loss carryover" on the consolidated return. Reg. 1.1502–21(b). However, River Hills had no net income during the consolidated return years in question, and therefore any carry forward of its net operating losses to the

consolidated return years would operate to offset only Wolter's income. This is precisely the type of net operating loss carryover prohibited by Reg. 1.1502–21(c).

■ The tax Court in the present case concluded that because Wolter and River Hills were not members of an affiliated group in the loss years (1968, 1969, short year 1970), as required by Reg. 1.1502(f)(2)(ii), the loss years were separate return limitation years. Because River Hills had no separate taxable income and therefore did not contribute to the consolidated taxable income for the tax years in question, (1970 & 1971), the carryover of the net operating losses sustained by River Hills prior to affiliation with Wolter was barred by Section 1.1502–21(c) of the Treasury Regulations.

### III.

Wolter's principal argument is that the net operating loss (NOL) carryover should be allowed under the Common Parent rule of Reg. 1.1502–1(f)(2) since Wolter and River Hills were commonly controlled when the losses were sustained. In the alternative taxpayer contends that Section 1.1502–2(c) of the Treasury Regulations is invalid to the extent that it prohibits the carryforward of River Hills' net operating losses from separate return limitation years.

To repeat, the carryover of net operating losses sustained by a member of an affiliated group in a separate return year is subject to the limitation imposed by Reg.

**6.** Reg. 1.1502–1(f) provides in pertinent part:
(2) i) A separate return year of the corporation which is the common parent for the consolidated return year to which the tax attribute is to be carried (except as provided in 1.502.-75(d)(2)(ii) and subparagraph (3) of this paragraph), or
(2) ii) A separate return year of any corporation which was a member of the group for each day of such year,
... provided that an election under section 1652(a) (relating to the privilege to elect multiple surtax exemptions) was never effective (or is no longer effective as a result of a termination of such election) for such year ...

**7.** Brother/sister corporations are corporations which have common shareholder control but

neither of which directly controls the other. Prior to their affiliation on March 2, 1970, Wolter and River Hills were brother/sister corporations since the majority of their stock was commonly controlled.

A "brother–sister controlled group" is defined to include a group of two or more corporations in which 5 or fewer persons own in the aggregate at least 80% of the combined value or voting power of the stock of each such corporation, and such same 5 or fewer persons own (in the aggregate) more than 50% of the combined value or voting power of the stock of each such corporation after taking into consideration stock of each such person in each corporation only to the extent it is owned identically in each corporation.

1.1502–21(c). Under that regulation the amount of a NOL of an affiliated group member arising in a separate return limitation year which may be carried forward on a consolidated return cannot exceed the income generated by the loss sustaining member for the taxable year in question.[8] This regulation prevents the affiliated group from obtaining any advantage from the carryover losses. A loss is usable only to the extent the loss corporation adds an equivalent amount of income to the consolidated tax return of the group.

Notwithstanding this general restriction on the carryover of NOL's arising in a separate return limitation year, Reg. 1.1502–1(f)(2) provides that a separate return year for the corporation which is the *common parent* of the affiliated companies for the consolidated return year is not generally considered a separate return limitation year (the so–called "lonely parent" rule). Accordingly, a NOL sustained in a separate return year by the common parent of an affiliated group is not subject to the limitation of Reg. 1.1502–21(c). The net effect is to allow pre–affiliation NOL's of the common parent to be used to offset post–affiliation profits of any member of the group.

Were the relationship between Wolter and River Hills different in a few critical respects, the regulations would allow the River Hills' losses to be employed to offset Wolter's income. For instance, if Wolter had possessed 80 percent control of River Hills when the losses were incurred, but a consolidated return was not filed, River Hills could have carried forward those losses to the consolidated return years. Similarly, if the losses in question were losses incurred by Wolter (which is now the "parent" of the affiliated group) in pre–affiliation years, the losses could be carried for-

ward onto the consolidated return regardless of Wolter's current income. Both of these hypothetical situations would exempt the early net operating loss years from the definition of "separate return limitations year," and it is only those losses from separate return limitation years which cannot be carried forward to consolidated return years unless the corporation which incurred the losses has sufficient consolidated return income to offset them.

Wolter argues that the common parent rule should be construed to permit the carryover of River Hills' NOL's since both companies were *commonly controlled* when the losses occurred. Underlying the common parent rule, appellant asserts, is a Congressional intent to make the use of NOL carryovers dependent upon the identity of the individuals involved rather than the form of the reorganization. Wolter asks this court to penetrate the form of the business intercourse so as to make the tax consequences turn on the substance of the transaction. *See e. g. Singleton v. Commissioner of Internal Revenue*, 569 F.2d 863 (5th Cir.), *cert. denied*, 439 U.S. 940, 99 S.Ct. 335, 58 L.Ed.2d 335 (1978). This is appropriate, Wolter continues, because the common parent rule is designed to permit the free use of loss carryovers when the party which suffered the past NOL's will be the same party which benefits from the NOL carryovers.

### A.

During our journey through the consolidated return regulations we must keep in mind that "Congress has delegated to the Secretary of the Treasury and his delegate, the Commissioner, not to the courts, the task of prescribing 'all needful rules and regulations for the enforcement' of the Internal Revenue Code. 26 U.S.C. 7805(a)."

---

**8.** The amount that a net operating loss carryover or carryback from a separate return limitation year may not exceed is defined in Section 1.1502–21(c)(2) of the Regulations as the excess, if any, of (i) consolidated taxable income (computed without regard to the consolidated net operating loss deduction), minus such consolidated taxable income, recomputed by excluding the items of income and deduction of the member of the group sustaining the loss, over (ii) the net operating losses attributable to such member that may be carried to the consolidated return year arising in taxable years ending prior to the particular separate return limitation year.

*United States v. Correll*, 389 U.S. 299, 307, 88 S.Ct. 445, 449, 19 L.Ed.2d 537 (1967). In analyzing appellant's challenge to the consolidated return regulations we start from the premise that Treasury Regulations "'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes,' and 'should not be overruled except for weighty reasons.'" *Bingler v. Johnson*, 394 U.S. 741, 750, 89 S.Ct. 1439, 1445, 22 L.Ed.2d 695 (1969), *quoting Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). Moreover, Section 1502 of the Code expressly authorizes the issuance of regulations to deal with the complex problems created by the filing of consolidated returns. This grant of legislative authority insures that "the rules will be written by 'masters of the subject,' *United States v. Moore*, 95 U.S. 760, 763 [24 L.Ed. 588] (1878), who will be responsible for putting the rule into effect." *National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979). Since Congress has delegated to the Secretary of the Treasury the responsibility for formulation of the statutory schema in the area of consolidated returns, any challenge to those regulations bears a greater burden than were the challenge directed at interpretive regulations which could be measured against specific Code provisions. Against this backdrop we proceed to consider appellant's challenge to the consolidated return regulations.

The Commissioner and the taxpayer agree that Wolter was and is the common parent of the affiliated group. Appellant's position is that River Hills should receive the same advantageous tax treatment which is generally given to the common parent, i. e. exemption from separate return limitation year treatment. Significantly, this exemption is not always available to the common parent and is not given only to

the common parent. It is from the exceptions to the favorable treatment generally accorded the common parent that Wolter extracts the policy that, by looking at the corporate law structure of the group, the separate return limitation year rules look beyond the corporate framework to the ownership of the corporations so as to permit use of a subsidiary's NOLs when the individuals who experienced the losses will reap the tax benefits from the carryover.

In support of its argument, taxpayer points to the fact that, under the Regulations, the common parent corporation's exclusion from the limitation on net operating loss carryforwards set forth in Section 1.1502–21(c) is itself subject to an exception in the case of a so–called "reverse acquisition." In a typical reverse acquisition in the loss carryover context, substantially all the assets or stock of a profit[9] corporation are nominally acquired by a loss corporation in exchange for more than 50 percent of the latter's stock, so that control of the loss corporation has shifted to the shareholders of the profit corporation as they existed prior to the acquisition. The Regulations essentially treat the *loss* corporation as having been acquired, and under Section 1.1502–1(f)(3) of the Treasury Regulations, all taxable years of the loss corporation prior to the reverse acquisition are treated as separate return limitation years, notwithstanding its status as the common parent corporation[10] of the new affiliated group consisting of it and the profit corporation. Conversely, the separate return years of the profit corporation prior to the acquisition are not treated, in general, as separate return limitation years. Accordingly, the net operating losses sustained by the loss corporation, but not the profit corporation, in its separate return years are subject to the carryover limitation contained in Section 1.1502–21(c). The purpose and effect of the reverse–acquisition rules

---

**9.** A corporation which does not possess tax attributes which the parties wish to preserve is here referred to as a "profit" corporation; a corporation possessing favorable tax attributes is referred to as a "loss" corporation. *Report on the Ancillary Tax Effects of Different Forms*

*of Reorganizations*, 34 Tax L.Rev. 477, 496 fn. 67 (1979).

**10.** See Treasury Regulations on Income Tax (1954 Code), 1.1502–75(d)(3)(i) (26 C.F.R.).

is to prevent trafficking in loss corporations. This is accomplished by redirecting the SRLY limitation to the ostensibly acquiring corporation. This "simple mechanical rule thwarts the attempts of those who would seek to present that the ailing David is trying to improve its financial strength by drawing on the earning power of Goliath." Gans, *supra* at 828.2.

The carryforward of net operating losses attributable to the common parent is also subject to a similar limitation designed to prevent loss trafficking in the event of a "consolidated return change of ownership" (C.R.C.O.). Reg. 1.1502–21(d). A "consolidated return change of ownership" is defined generally in Section 1.1502–1(g) of the Treasury Regulations as a more than 50 percentage point change in ownership in the common parent corporation that occurs during a two–year period.[11] If a consolidated return change of ownership occurs, then under Section 1.1502–21(d) of the Regulations, the net operating losses attributable to the common parent before the change (together with the net operating losses attributable to the other corporations, if any, that were members of the group before the change) may be carried over to consolidated return years ending after the change only to the extent that the common parent (and the other corporations that were members of the group before the change) contribute to the consolidated taxable income of the group. This limitation hampers the tax avoidance motive of a party which infuses new capital into the common parent with the intention of having it acquire profitable subsidiaries.

A third, and more drastic,[12] limitation on the carryforward of net operating losses attributable to the common parent corporation becomes effective upon the occurrence of a more than a 50 percentage point change of ownership in the common parent

corporation within a two–year period, coupled with the common parent's discontinuance of the trade or business conducted by it prior to the change of ownership. In such a case, the carryforward of a net operating loss attributable to the common parent is disallowed in its entirety.[13]

On the basis of these three limitations on the carryforward of net operating losses attributable to the common parent corporation, taxpayer argues that the purport of the regulations is to allow the free use of loss carryovers when–and only when–the individual shareholders who suffered the losses will get the majority of the benefit from the carryover deduction.

Appellant considers this different treatment of the common parent and a subsidiary in Reg. 1.1502–21(c) to constitute no more than a formalistic distinction which thwarts Congress' intention to make loss carryover use depend upon the identity of the individuals involved rather than the form of the reorganization. Wolter analogizes this alleged inconsistency with this court's decision in *Commissioner v. General Machinery Corp.*, 6 Cir., 95 F.2d 759 (1938), invalidating a consolidated return regulation because the regulation disallowed a NOL carryover which section 117(b) of the 1928 Internal Revenue Code clearly intended to permit. Section 117(b) permitted net operating losses to be carried forward to the two subsequent taxable years; the clear purpose of the 1928 Act was to stabilize corporate income over three–year periods. The Commissioner, however, promulgated Regulation 75 which required that when two corporations affiliated during the taxable years of the acquired corporation, that corporation had to file a separate return for that portion of the year prior to affiliation, which in turn constituted a separate taxable year. The net effect of Reg. 75 was to limit NOL carryover of the acquired corpo-

---

11. See Bittker & Eustice, *Federal Income Taxation of Corporations and Shareholders* (3d ed.), par. 15.24, p. 15–70.

12. See Bittker & Eustice, *Federal Income Taxation of Corporations and Shareholders* (3d ed.), par. 15.24, pp. 15–70, 15–71.

13. See Treasury Regulations on Income Tax (1954 Code), 1.1502–21(e)(1).

ration to two calendar years. By limiting the carryforward to two years for an acquired corporation, the regulation manifestly conflicted with 117(b). This court found the Commissioner's proffered justification of tax avoidance prevention to be illusory in light of the ability of two corporations to program any reorganization so as to affiliate at the beginning of the calendar year. The court also concluded that the regulation did not help to clearly reflect income, as income remained the same whether computed for the whole year or for separate periods.

*General Machinery* supplies a suitable paradigm for use in explaining our reasons for rejecting Wolter's arguments. Conspicuously absent in the consolidated return area is some constructive guidance from Congress as to the nuts and bolts for computing income of consolidated corporations. Unlike § 117(b) of the Code which the *General Machinery* court used as a measuring rod, Wolter cites no consolidated return Code provision with which the instant regulations conflict.

Instead, it relies upon a policy here extracted from the Regulations that the taxpayer who suffers the loss should reap its benefit. In other words, the business (River Hills) which suffered the 1968 and 1969 losses was the business of the parties who controlled what eventually became the affiliated group, and the parent corporation (Wolter) which controlled the stock of the subsidiary (River Hills) was the taxpayer which suffered the actual economic loss.

While a focus on the identity of the taxpayer can be viewed as a common thread running through the consolidated return regulations, careful examination reveals that the regulations are designed to prevent "trafficking" in loss corporations. As an example, the CRCO limitation is aimed at the acquisition of a loss group by the owners of a profitable corporation who then seek to apply the former's loss carryovers against the latter's income on a consolidated return.[14] The reverse acquisition regulations reverse the substance of the acquisition for tax purposes so that acquisitions *by* loss groups are limited by the relative size test of the rules to see which party to the acquisition is to be subject to the SRLY strictures of Reg. 1.1502–1(f).[15] The regulations also impede the acquisition of a corporation with "built–in" losses (such as depreciated stock in trade, plant or capital assets and debts that are about to become worthless) for the purpose of utilizing these losses to offset post–affiliation consolidated income attributable to other members of the group. Reg. 1.1502–15. The SRYL limitation at issue here is designed to discourage an affiliated group of corporations from acquiring a loss corporation merely for the NOL carryover. Basically, Reg. 1.1502–21(c) refuses to allow commonly controlled corporations which chose to be treated as separate corporations prior to affiliation to undo retroactively that decision when it would benefit the group tax–wise. The consolidated return regulations thus distinguish between affiliation and non–affiliation years. The principle of drawing the line between affiliated and non–affiliated years is appropriate because it allows greater flexibility and avoids the disadvantages of "trafficking in loss corporations.'" *See* Dunn, *The New Consolidated Return Regulations May Preempt the Field in Determining the Allowance of Operating Losses,* 23 Tax L.Rev. 185, 188 (1968).

Our analysis reveals that the consolidated return regulations permit a liberalized ap-

---

**14.** See Bittker & Eustice, *supra* n.9, par. 15.24, p. 15–70. The CRCO theory is that if there is more than a 50% change in ownership, the new owners should not be allowed to use losses incurred prior to their acquisition of the parent company to offset benefits generated by the companies which were not members of the affiliated group which incurred the losses. By drawing a line between the affiliated and non-affiliated period, this provision does not disal-

low the losses but rather limits their use to the offsetting of income of the group of "old members" of the consolidated group which incurred the losses. These corporations that were members of the group immediately preceding the first day of the taxable year in which the change took place are described as "old members." Reg. 1.1502–1(g)(3)(9i).

**15.** *Id.*

proach to the use of carryovers. A NOL sustained by a member in a separate return year is freely available against consolidated taxable income before NOL deduction in a consolidated return year. On the other hand, limitations are placed on the availability of NOL carryovers of a particular member sustained in a separate return limitation year. The consolidated return regulations permit disregard, to a considerable degree, of transactions among the corporate affiliates making the return. The consolidated return computations are not, however, based on a consolidated accounting of all income and capital items as though the properties of the subsidiaries were owned by the parent. Instead, for most items there are separate computations for each corporate entity. Actual consolidation of accounts is limited to certain specified items which are aggregated for all members. In this regard, the filing of a consolidated return is not the functional equivalent of a merger. The members of the affiliated group still retain their separate identities and still compute their income as if they were separate.[16] The loss member remains a separate corporation after the consolidation and there is no conceptual reason to offset the separate return losses against consolidated income, particularly when section 1502 commands the regulations to help to clearly reflect the income of each group member. Nor do we believe that the common ownership of the brother–sister corporations prior to affiliation supplies an essential element of difference substantial enough to warrant judicial creation of SYRL exemption here.

■ The degree to which tax attributes, specifically net operating losses, will survive in a corporate reorganization depends in part on the form of the reorganization. *Report on the Ancillary Tax Effects of Different Forms of Reorganizations*, 34 Tax L.Rev. 477, 495 (1979). Taxpayer's decision to convert the brother–sister relationship into a parent–subsidiary relationship must be considered a conscious decision to restructure the corporate framework. It is axiomatic that a taxpayer must accept the tax consequences of his structural choice, whether contemplated or not. *Commission-*

16. Indeed, prior to enactment of the Treasury Regulations in this area the Supreme Court had established a similar limitation. *See Woolford Realty Co. v. Rose*, 286 U.S. 319, 52 S.Ct. 568, 76 L.Ed. 1128 (1932). In *Woolford*, Justice Cardozo writing for a unanimous Court addressed an attempt by an affiliated group filing a consolidated return to carryover and deduct a net loss sustained by a member of the group prior to affiliation when that member had no taxable income for the year in which the consolidated return was filed. Section 240 of the Revenue Act of 1927 permitted affiliated corporations to file consolidated returns and provided that in assessing the income tax on the consolidated return, the total tax would be computed on the basis for the net income properly attributable to each. Section 206(b) permitted a taxpayer sustaining a net loss in one year to deduct it in computing net income for the next year and, if it exceeded that net income (computed without such deduction), to deduct the excess in computing the net income for the next succeeding (third) year.

Woolford Realty became affiliated with Piedmont Savings in 1927; in that year Piedmont had no taxable income. In the two years prior to affiliation (1925/26) Piedmont had experienced net losses. On the consolidated return filed for 1927 the group attempted to deduct Piedmont's pre–affiliation losses from the con- solidated income for 1927, which was attributable solely to Woolford. Emphasizing that each of the corporations joined in a consolidated return remained a separate taxpayer, the Court held that the net loss deduction was not permitted by Section 206(b) except from the net income of the corporation suffering the loss (Piedmont). Since Piedmont had no taxable income for 1927, its 1925/26 losses could not be carried over and deducted on the 1927 consolidated return. A contrary holding, the Court emphasized, would permit tax evasion by the purchase and sale of tax losses, and would frustrate the purpose of the consolidated return provision which was to require taxes to be levied according to the true net income resulting from a single business enterprise, even though it was conducted by means of more than one corporation.

In *Planters Cotton Oil Co., Inc. v. Hopkins*, 286 U.S. 332, 52 S.Ct. 509, 76 L.Ed. 1135 (1932), the Court relied upon *Woolford* in refusing to permit the losses of two unincorporated associations taxable as one corporation to be carried over to offset the income of three new corporations when a consolidated return was filed covering the two associations and three corporations, even though the new corporations had succeeded to the principal assets of the associations.

*er v. National Alfalfa Dehydrating,* 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974); *Old Mission Portland Cement Co. v. Helvering,* 293 U.S. 289, 293, 55 S.Ct. 158, 160, 79 L.Ed. 367 (1934). Having chosen one route of reorganization, Wolter is now foreclosed from enjoying the tax benefits of an alternative form.

■ To conclude that River Hills is entitled to an exemption from the SRLY restriction would require us to make a leap that we are unwilling to take. First, it would require an assumption that an exception to the SRLY rule for commonly controlled brother–sister corporations was inadvertently omitted from the consolidated return regulations. Second, it would require us to overrule a legislative regulation so as to permit a deduction based only upon a generalized policy distilled from the regulations and symbiotic Code provisions. Even if we were to assume that the instant transaction was indistinguishable, as a matter of economic reality, from the common parent exception, we would not be required to recognize a claimed deduction for the carryover of River Hills' net operating losses. "The propriety of a deduction does not turn upon general equitable considerations, such a demonstration of effective economic and practical equivalence. Rather, it depends upon legislative grace; and only as there is clear provision therefore can any

particular deduction be allowed." *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934); *Commission v. National Alfalfa Dehydrating, supra.* Reg. 1.1502–21(c) is a clear expression that a particular deduction is limited; conspicuously absent from the Code is any clear provision which allows the deduction in full.

### B.

■ Undeterred by the lack of any express Code provision, Wolter attempts to superimpose onto the consolidated return regulations a Congressional intent lifted from Sections 269, 381 and 382 of the Code.[17] Taxpayer places primary reliance on Section 269 as demonstrating Congressional intent to allow the offsetting of NOLs sustained by a corporation prior to group affiliation against that portion of consolidated taxable income contributed by another member of the group after affiliation, so long as the two corporations were commonly controlled prior to affiliation.

Section 269 provides that a tax benefit will be disallowed if the principal purpose of the acquisition of control of a corporation, or of the acquisition by a corporation from another corporation of property with a carryover basis, is tax avoidance by securing such tax benefit.[18] Specifically exempt-

---

17. As a preliminary observation we note that Reg. 1.1502–21(c) constitutes a *limitation* provision, while the Code sections cited by Wolter are *disallowance* provisions.

18. Section 269 provides in pertinent part:
   (a) **IN GENERAL**–If–
     (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or
     (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other

allowance which such person or corporation would not otherwise enjoy, then the Secretary may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.
   (b) **POWER OF SECRETARY TO ALLOW EDUCATION, ETC., IN PART.**–In any case to which subsection (a) applies the Secretary is authorized–
     (1) to allow as a deduction, credit or allowance any part of any amount disallowed by such subsection, if he determines that such allowance will not result in the evasion or avoidance of Federal income tax for which the acquisition was made; or
     (2) to distribute, apportion, or allocate gross income, and distribute, apportion or allocate the deductions, credits, or allow-

ed from the scope of 269, however, is a corporation's acquisition of a commonly owned corporation's property. Wolter argues that this exemption also extends to corporate acquisition of the *control* of a commonly owned corporation, a condition not explicitly immune from the coverage of Section 269. This lack of parallelism, difficult to justify as a matter of policy,[19] has led one court to conclude that the exemption for acquisition of a commonly owned corporation's property also applies to acquisition of the control of a commonly owned corporation. *Southland Corporation v. Campbell*, 358 F.2d 333 (5th Cir. 1966). Wolter then relies upon *Zanesville Investment Co. v. Commissioner*, 335 F.2d 507 (6th Cir. 1964), which concerned two corporations which had been commonly owned prior to their affiliation as parent and subsidiary. The issue was whether deductions resulting from expenses incurred after acquisition and which produced losses in the acquired corporation could be disallowed under Section 269 in computing the consolidated taxable income of the affiliated group. Subsequent to the affiliation the parent expended substantial sums to subsidize the subsidiary's continuing losses. In filing a consolidated return the group sought to offset the subsidiary's post–affiliation losses against the parent's post–affiliation income. Relying upon the disallowance provisions of Section 269, the Commissioner concluded that because the losses could have been anticipated when the companies affiliated,

they could not be used to offset income of the other group member.

The Tax Court held that the parent corporation had acquired control of the subsidiary for the principal purpose of making use of the anticipated deductions and losses of that company in the consolidated return. This court reversed, finding in the legislative plan for net operating losses no intent to disallow postacquisition losses which were incurred economically after the acquisition. We noted that Section 1.1502–31(b), the consolidated return regulation which treated the use of post–affiliation losses against post–affiliation consolidated income, allowed the losses, and concluded: "The overall purpose of Section 269 was to prevent distortion of a taxpayer's income resulting from the utilization of someone else's loss on a built–in but unrealized loss." 335 F.2d at 514 (emphasis omitted).[20]

Wolter urges that the force of *Southland* and *Zanesville* requires a parallel conclusion with respect to pre–affiliation loss carryovers of commonly controlled companies. This argument misses the mark. Even were we to adopt the holding of *Southland* so as to exempt Wolter's acquisition of control of River Hills from the scope of Section 269, it does necessarily follow that a deduction is available. *Zanesville* implicitly recognizes that there is a rational basis for delineating between pre– and post–acquisition losses and further delineating between economically incurred pre– and post–acqui-

ances the benefit of which was sought to be secured, between or among the corporations, or properties, or parts thereof, involved, and to allow such deductions, credits, or allowances so distributed, apportioned, or allocated, but to give effect to such allowance only to such extent as he determines will not result in the evasion or avoidance of Federal income tax for which the acquisition was made; or

 (3) to exercise his powers in part under paragraph (1) and in part under paragraph (2).

*See* generally, Watts, *Acquisitions Made to Avoid Taxes: Section 269*, 34 Tax L.Rev. 539 (1979); Geller, *Utilization of Loss Carryovers Following an Acquisition*, 32 N.Y.U. Inst. 511 (1974); Feder, *The Application of Section 269 to Corporations Having Net Operating Loss*

*Carryovers and Potential Losses*, 21 N.Y.U. Inst. 1277 (1963).

**19.** Bittker & Eustice, *supra* at p. 15–69.

**20.** Section 269, however, has been applied to deny post–acquisition losses that would not otherwise be inhibited by the consolidated return regulation limitations. *Compare United States v. Hall Paving Corp.*, 471 F.2d 261 (5th Cir. 1973), *R. P. Collins & Co., Inc. v. United States*, 303 F.2d 142 (1st Cir. 1962), *Borge v. Commissioner*, 405 F.2d 673 (2d Cir. 1968), *cert. denied sub nom. Danica Enterprises, Inc. v. Commissioner*, 395 U.S. 933, 89 S.Ct. 1994, 23 L.Ed.2d 448 (1969), *and Luke v. Commissioner*, 351 F.2d 568 (7th Cir. 1965), *with Herculite Protective Fabrics Corp. v. Commissioner*, 387 F.2d 475 (3rd Cir. 1968), *and Zanesville, supra*.

sition losses. Common ownership was not the *sine qua non* of *Zanesville*; instead it was the presence of a consolidated return regulation which allowed the deduction and the legislative history of § 269 which supported allowance of the carryover. Common sense dictated that the group would not incur post–acquisition expenses for the purpose of gaining a tax deduction limited to such expenses. Moreover, the availability of a deduction under the general disallowance provisions of Section 269 does not supercede or override the specific disallowance provisions of Reg. 1.1502–21(c). For example, section 1.269–6 of the regulations states that Section 269 "may be applied to disallow a net operating loss carryover even though such carryover is not disallowed (in whole or in part) under section 382 and the regulations thereunder." Section 269's failure to preempt other Code provisions applies with equal force here: the consolidated return regulations may be applied to disallow a deduction even though that deduction is not disallowed under Section 269. The particular limitation provision of Reg. 1.1502–21(c) has requirements for application that differ from the disallowance provision of Section 269, even apart from the tax avoidance test, particularly the attribution rule. While the consolidated return regulations and section 269 are not mutually exclusive, in certain circumstances, as here, they may operate separately. And regardless of when they operate, there are substantial differences between the criteria

for how they operate. Section 269 requires that the acquisition be for the principal purpose of evading or avoiding income tax by securing the benefit of a deduction, credit or other allowance. There is no such intent element in the consolidated return regulations. Under those regulations the limitations of losses are unaffected by the purpose which motivated the acquisition. Section 269 also disallows the loss entirely, whereas the regulations simply limit the deductibility of the loss.

The Commissioner does not confront Wolter's § 269 argument directly, but rather responds by noting that under the regulations promulgated under the 1939 Code predecessor of Section 1502, the carryover of a NOL sustained by an affiliated group member in a separate return year was limited to an amount not exceeding the net income of that member included in the consolidated taxable income of the group for the year to which the carryover was made.[21] These regulations were incorporated virtually intact by the House of Representatives into the bill that was ultimately enacted as the Internal Revenue Code of 1954. The Senate, however, eliminated the provisions incorporating the regulations in order to allow them to be amended without Congressional action. Although generally accepting the regulations, the Senate preferred the administrative advantages of having the rules promulgated as legislative Trea-

---

**21.** These provisions appeared in Section 23.-21(d)(3) of Treasury Regulations 104 (1939 Code) (26 C.F.R., 1949 ed.) and were readopted in Section 24.31(b)(3) of Treasury Regulations 129 (1939 Code) (26 C.F.R., 1953 ed.). Following the enactment of the Internal Revenue Code of 1954, they reappeared, without significant change, in Section 1.1502–31(b)(3) of the Treasury Regulations on Income Tax (1954 Code) (26 C.F.R., 1955 ed.). Subsequently, T.D. 6813, 1965–1 Cum.Bull. 436, 437, and T.D. 6874, 1966–1 Cum.Bull. 207, 208, amended the Regulations to permit an unlimited carryforward of net operating losses sustained by members of affiliated groups in separate return years, provided that the members were affiliated with the groups on each day of the separate return year. Finally, in the general revision of the consolidated return Regulations adopted by T.D. 6894, 1966–2 Cum.Bull. 362, in 1966, the

rule concerning the carryforward of net operating losses was further liberalized to permit net operating losses sustained by a common parent corporation in separate return years to be carried forward to a consolidated return year without regard to that portion of the consolidated taxable income contributed by the common parent. *See* Treasury Regulations on Income Tax (1954 Code), Sections 1.1502–1(f)(1) and (2), 1.1502–2–21(c).

Some of the early consolidated return regulations limited the loss carryover from a separate return to a consolidated return, not by the income of the corporation with which the loss originated, but by the cost to the parent corporation of the stock of the corporation with which the loss originated. *See Commissioner v. Hughes Tool Co.*, 118 F.2d 474 (5th Cir. 1941).

sury Regulations.[22] S.Rep.No.1622, 83d Cong., 2d Sess. 120 (1954), *reprinted in* (1954) U.S.Code Cong. & Admin.News 4621, 4753. The Commissioner and the Tax Court relied heavily upon this specific indication of Congressional approval in rejecting taxpayer's argument that Congressional policy favors allowance of the NOL carryovers here.

Wolter strenuously asserts that this manifestation of congressional approval was vitiated by the Revenue Act of 1964 and the 1966 changes in the consolidated return regulations. Prior to 1964, affiliated groups were paying a 2% penalty tax for the privilege of filing a consolidated return. Corporations filing a consolidated return were also limited to one corporate surtax exemption, whereas affiliated corporations filing separate returns were each entitled to a separate deduction from corporate surtax. Section 1503(a).

The Revenue Act of 1964, P.L. 88–272, amended Code Section 1503(a) to eliminate the two percent penalty tax on consolidated returns, and enacted Sections 1561–1563, which imposed a six percent penalty tax on the surtax–free income of corporations who belonged to a "consolidated group" (defined in Section 1563) but who elected to use more than one surtax exemption between them (the so–called "multiple surtax exemption"). The 1964 Act also gave a consolidated group the right to terminate retroactively its election of multiple surtax exemptions (Section 1563(c)).[23]

The pre–1966 consolidated return regulations allowed a corporation to carry over losses for use against the income of other consolidated group members only if the group members had filed consolidated returns for the years in which the losses occurred. Regs. 1.1502–31(a)(3) and (b)(3). Obviously, the Commissioner did not wish to permit a group to take advantage of the multiple surtax exemptions and other benefits of separate filing, and, then, when the unused losses began to mount, permit their utilization merely by switching to consolidated filing. *See* Salem, *How to Use Net Operating Losses Effectively Under the New Consolidated Return Regulations*, 26 J. of Taxation 270, 271 (1967). Wolter acknowledges the legitimate tax–avoidance thrust of the pre–1966 regulations, but argues that the 1964 repeal of the 2% penalty tax and the implementation of the right of a controlled group to use multiple surtax exemptions without paying a penalty tax erased the statutory advantage of filing separate returns. Thus, the argument goes, there was no longer a reason to prevent the use of separate return year losses on subsequent consolidated returns. The implication from this is that the regulations were designed to prevent tax avoidance when Congress "approved" them in 1954; the 1964 changes eradicated that purpose and therefore rendered the Congressional endorsement obsolete. The absence of specific Congressional ratification of the 1966 regulations is, however, insufficient justification for invalidating the contested regulation. The consolidated return regulations, unlike ordinary Treasury regulations, are legislative in character and have the force and effect of law. Absent a conflict with the Code, we must sustain the validity of Reg. 1.1502–21(c).

## C.

■ Wolter also relies on sections 381 and 382 of the Code as another indication of Congressional resolve to structure the tax consequences as a function of the economic substance of a transaction. Section 381 addresses when a surviving company succeeds

---

22. The courts, as well as the Congress, referred approvingly to the regulations. *See Likins–Foster Honolulu Corp. v. Commissioner*, 417 F.2d 285 (10th Cir. 1969); *Phinney v. Houston Oil Field Material Co.*, 252 F.2d 357 (5th Cir. 1958). In *Phinney* an affiliated group which filed consolidated returns for 1948 and 1949 and which included a subsidiary formed in 1949 which had a loss in 1949 was denied the right to carryback against consolidated net income the portion of the group's 1949 NOL which was attributable to the subsidiary formed in 1949.

23. The Tax Reform Act of 1969 amended Section 1563, phasing out completely the right of a consolidated group to use multiple surtax exemptions.

to the loss carryovers of an acquired company in certain types of acquisitions. Section 382 deals generally with changes in the ownership of a loss company though a purchase of its stock or a tax free reorganization. Under Section 382(a), a corporation forfeits its loss carryovers if a majority in value of its shares have changed hands since the losses occurred.[24] Section 382(b) contains special rules regulating the use of NOL carryovers after two corporations have merged in a tax–free reorganization.[25] Section 382, as amended by the Tax Reform Act of 1976, focuses exclusively on continuity of shareholder proprietary interest (specially defined) as the touchstone for preservation of a corporation's loss carryover history.[26] This exclusivity of focus, also present in the pre–1976 version of section 382 in force here, Wolter argues, is an express recognition that Congress wants the use of loss carryovers to turn on the identity of the ultimate individuals involved so as to minimize the importance of the corporate form of reorganization. While Sections 381 and 382 are inapplicable to this case directly, the premium placed on the continuity of shareholders' proprietary interest by § 382 is diluted by the provisions of § 381. The

rules set forth in Section 381 of the 1954 Code are applicable if the assets of a corporation are acquired by another corporation either in (a) a liquidation of a subsidiary under Section 332 (other than a liquidation that is treated as a purchase of assets under Section 334(b)(2) or (b) an "A," "C," "D" or "F" reorganization under Section 368(a)(1).[27] If the transaction comes within the purview of Section 381, the acquiring corporation succeeds to the tax attributes of the transferor corporation specified in Section 381(c), one of which is net operating loss carryovers.

Section 381 does not, however, apply to the acquisition of stock of a loss corporation, or to the acquisition by a loss corporation of the stock or assets of a profitable business enterprise. Rather, the preservation of the loss corporation's own net operating loss carryovers in these types of transactions is dependent on compliance with the provisions of sections 269 and 382.

Where a member of the group is the successor corporation in a 381 transaction, any net operating losses of the predecessor corporation are considered to have occurred in a SRLY if the predecessor was not a member of the group for each day of such

---

**24.** Prior to Tax Reform Act of 1976, losses would be denied in full under section 382(a) only if both a change of ownership and a change of business occurred. This provision is in force for the tax years here in issue.

If ownership of the loss company's stock changes by more than 60 percentage points during three years, then losses of the current year, and loss carryovers from prior years, are reduced under section 382(a)(2) by 3.5 percent for each percentage point change between 60 and 80 percent, and 1.5 percent for each percentage point change in excess of 80 percent. Thus, if the change of ownership is 60 percent, no reduction occurs, even though the loss company abandons its former business.

**25.** Section 382(b) provides that to the extent shareholders of the loss company fail to receive (or maintain), as a result of the reorganization, the requisite statutory stock ownership interest in the acquiring corporation, losses will be reduced accordingly. Preexisting proprietary interests of the loss company's shareholders in the acquiring company do not count for purposes of measuring the loss company stockholders' minimum stock ownership require-

ment under Section 381(b)(1). *See Commonwealth Container Corp. v. Commissioner*, 393 F.2d 269 (3d Cir. 1968).

**26.** Eustice, *The Tax Reform Act of 1976: Loss Carryovers and Other Corporate Changes*, 32 Tax L.Rev. 113, 118 (1977).

**27.** Assets acquired in the following types of section 368(a)(1) reorganizations permit the loss carryovers to be utilized by the acquiring corporation:

(1) "A"–Statutory merger or consolidation.

(2) "C"–Acquisition of substantially all of the properties of another corporation in exchange solely for voting stock.

(3) "D"–A transfer by a corporation of all or part of its assets to another corporation controlled by the transferor corporation or its shareholders followed by a distribution of the shares received upon the exchange.

(4) "F"–A transfer of assets by one corporation to another corporation, the transferee corporation merely changed in identity, form or place of organization.

year.[28] The lonely parent rule does not apply in these situations, and the loss carryovers are subject to the SRLY restrictions, despite the fact that the common parent may be the successor corporation in the 381 transaction. Regs. 1.1502–1(b), 1.1502–1(f). The amount of the net operating losses that can be carried to a consolidated return year is limited to the entire taxable income of the successor member and not solely to the income from the assets received in the 381 transaction. Reg. 1.1502–21(c)(1). *See* Crestol, Hennessey & Rua, *The Consolidated Tax Return*, 211 (2d ed. 1973) (1979 supp.). Thus, the preacquisition years of the acquiring corporation may be SRLY's despite the fact that the loss carryovers were actually incurred by the transferor corporation. This is consistent with the Section 381(b)(3) proscription of the carryback of post–acquisition net operating losses of the acquiring corporation to pre–acquisition taxable years of the transferor.

### D.

■ This court recognizes that taxpayer's arguments are not without force as a matter of tax policy. The limitation of Reg. 1.1502–21(c) *vis a vis* commonly controlled brother–sister corporations is somewhat incongruous when compared with related Code provisions. Yet the law relating to consolidated returns is unique. Those regulations are designed to deal with the peculiar problems of treating several corporations as a tax unit. Our rule "in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the Congressional mandate in some reasonable manner." *United States v. Correll, supra*, at 306–307, 88 S.Ct. at 449. Based upon the foregoing analysis we conclude that the consolidated return regulations at issue here fall within that prescription.

The decision of the Tax Court is Affirmed.

---

28. For an illustration of the concurrent application of Section 381(c)(1) of the Code and 1.1502–2(c) of the regulations to compute a consolidated net operating loss deduction, see Rev.Rul. 75–378, 1975–2 C.B. 355. There, a group had filed separate returns and claimed multiple surtax exemptions (so the SRLY rules applied), then filed consolidated returns, and finally liquidated the loss subsidiary into the parent.