**UNITED STATES of America, Plaintiff,**

v.

**Jay RODE, Judith Rode, Jay Rode II, Jack Rode, and Jeff Rode, Defendants.**

**No. G87–844 CA1.**

United States District Court, W.D. Michigan.

June 27, 1990.

---

John A. Smietanka, U.S. Atty., Michael L. Shiparski, Asst. U.S. Atty., Grand Rapids, Mich., Thomas J. Clark, U.S. Dept. of Justice, Tax Div., Washington, D.C., for plaintiff U.S.A.

Curt Shelton, Vancouver, Wash., for defendants.

## OPINION

BENJAMIN F. GIBSON, District Judge.

### INTRODUCTION

In this action, the United States seeks to reduce to judgment federal income tax assessments for the tax years 1977, 1978 and 1980 against the defendants Jay and Judith Rode.[1] The government also seeks to set aside, as a fraudulent conveyance, the transfer of a farm located at 1566 Ten Mile Road, Sparta, Michigan from Jay and Judith Rode to their sons, defendants Jay Rode II, Jack Rode and Jeff Rode, and to foreclose its federal tax lien on the property. Following a bench trial commencing on

March 27, 1990 and concluding on March 28, 1990 and pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. 1980 TAX YEAR

Beginning in 1976 and continuing through the early to mid–1980s, the taxpayers operated bingo games. The Rode family initially operated these games in Grand Rapids, Michigan from 1976 to 1979. Starting in 1980, they moved their bingo operations to Portland and Salem, Oregon.

These games were originally operated in Michigan under the guise of the Universal Life Church. At that time, the Universal Life Church of Modesto, California enjoyed tax-exempt status under the Internal Revenue Code of the United States.[2] Due to that status, the church was entitled to bingo licenses under Michigan law. Defendant Jay Rode, upon the representation that he was a minister associated with this church, received the necessary licenses to conduct bingo in Michigan. These licenses were subsequently revoked by the Commissioner of Lottery when it was learned that Jay Rode falsely represented that his church was associated with the California church. This revocation was upheld when Jay Rode sought judicial review of the Commissioner's decision. *Universal Life Church, Inc. v. Commissioner of Lottery*, 96 Mich.App. 385, 292 N.W.2d 169 (1980).

After the revocation of the Michigan licenses, defendant Jay Rode, representing himself as a director of fund raising activities for the Universal Life Church, sought and received a bingo license from the Oregon Department of State. In mid-February, the Rodes began operating bingo games in Salem. They also commenced bingo operations in Portland no later than March of 1980. Both games were operated under the guise of the Universal Life

---

1. At trial, the taxpayers agreed to consent to judgment for tax years 1982 and 1983.

2. By a letter ruling, dated August 24, 1984, the tax exempt status of the Universal Life Church

of Modesto, California was revoked, effective May 1, 1977. The Claims Court subsequently affirmed this revocation. *Universal Life Church, Inc. v. United States*, 13 Cl.Ct. 567 (1987).

Church. Sometime in 1981, the taxpayers began operating their games under the guise of the Science Christians United Truth Church. In the mid–1980s, they began to conduct their games under the guise of the First Family Life Christian Church.

There was extensive testimony from defendant Jeff Rode.[3] at trial concerning the Oregon bingo operations. Jeff Rode was responsible for the day-to-day management of the Salem bingo games after his arrival in Oregon in October of 1980. His sister managed the Portland bingo operations. However, both of them reported to their father, defendant Jay Rode. According to Jeff Rode, it was their father who determined how the bingo operations would be run and how the bingo revenues would be spent.

He also testified that his parents considered the bingo operations to be a means of earning a living, not a fund raising activity for a church. He specifically mentioned that they purchased several automobiles and a motorhome for themselves with bingo proceeds. He further stated that his father's goal was to earn, through the operation of bingo games, a million dollars for each member of his family.

The other evidence presented to the Court at trial is consistent with this testimony of defendant Jeff Rode. For example, an account, entitled "Universal Life Church—Special Fund Raising Account," was established with the United States National Bank of Oregon. According to the bank signature cards, the only people authorized to use this account on behalf of the church were defendants Jay and Judith Rode. Furthermore, there is no evidence before the Court that would indicate that the monies deposited into this account were used for the type of activities, e.g., evangelical, missionary or charitable activities, normally associated with religious institutions.

In the spring of 1983, Jay and Judith Rode's 1980 federal income tax return was audited by Revenue Agent James Knight. He requested that they meet with him and produce various documents relating to

their 1980 return. Agent Knight received no cooperation from these defendants during the course of his audit.

During the course of the audit, the Internal Revenue Service (hereinafter "IRS") concluded that the net proceeds from the bingo operations should be included in Jay and Judith Rode's gross income. The IRS determined that once the net proceeds were included in the taxpayers' gross income, they realized taxable income of $404,403.00 for 1980,[4] giving rise to a tax liability of $192,670.00. The IRS further determined the failure to claim this sum as income was due to fraud, giving rise to a fraud penalty of $96,335.00.

The IRS made this determination in the following manner. Beginning, in late 1981, persons or entities conducting bingo in Salem, Oregon were required to file reports with the Salem Police Department. These reports indicated the number of players per bingo session, the gross profit per session, and the net profit per session. The IRS obtained the reports filed by Jay and Judith Rode for five days in November of 1981, eighteen days in April of 1982 and five days in February of 1983. The IRS averaged the net profit per session during these time periods and projected this average over that portion of the 1980 calendar year during which the bingo games operated in Salem, Oregon.

The IRS also divided this number, the average net profit, by the average number of players per session as reflected in the same police reports. This calculation resulted in the net profit per player per session for the Salem bingo operations. The figure was $3.98. During the course of the audit in 1983, Agent Knight discovered a article in the newspaper, *The Oregonian*, which discussed Jay and Judith Rode's bingo operations in Portland and Salem. This article stated that the Portland operation averaged approximately 350 players per session during 1983. Using the Salem bingo net profit per player per session, the IRS projected the profits for the Portland

---

3. Jeff Rode currently goes by the name of Jeff Farrell.

4. Defendants Jay and Judith Rode reported their taxable income for 1980 as $5,277.79.

bingos based on an average of 350 players per session.

Based upon these calculations, the IRS determined that Jay and Judith Rode earned gross profits of $486,611.00 during 1980 from their bingo operations. The IRS, based upon Agent Knight's review of the cancelled checks from the above-mentioned Special Fund Raising Account, also gave Jay and Judith Rode deductions totalling $87,436.00. These deductions resulted in Jay and Judith Rode having a taxable income of $399,175.00 from the bingo operations.

In its proposed finding of facts, the government has admitted that due to start up difficulties both the Salem and Portland bingos averaged far fewer players per session in 1980 than that estimated by the IRS based on figures from subsequent years. Accordingly, in its proposed findings of fact, the government has recalculated Jay and Judith Rode's 1980 taxable income.

The government now maintains that Jay and Judith Rode underreported their gross income for the 1980 tax year by $270,508.96. In support of this figure, the government relies heavily on the testimony of defendants Jeff Rode and Jay Rode II and the deposit records from the Special Fund Raising Account.

The government reached its conclusion regarding Jay and Judith Rode's 1980 income in the following manner. According to the plaintiff, the testimony of both Jeff Rode and Jay Rode II reveals that the family deposited the revenues from its Portland and Salem bingo operations in separate accounts and that the funds deposited into the Special Fund Raising Account were the proceeds of only the Salem bingo proceeds. The government further maintains that their testimony also indicates that the patronage of both bingo operations by customers was comparable in 1980. From this testimony, the government has concluded that the funds deposited into the Special Fund Raising Account during 1980, $122,754.48, are the net profits from the Salem bingo. It has also concluded that a second account with a similar level of deposits must have been in existence during 1980 since the Portland and Salem proceeds were kept in separate accounts and both bingos experienced comparable levels of profitability in 1980.

To further support its conclusion that two bank accounts were in existence in 1980, the government notes that defendant Jeff Rode testified that before he moved to Oregon he sold some of his father's farm and tool and die equipment for $25,000.00, an amount that the government has included as income in its recalculation of Jay and Judith Rode' 1980 income. According to the government, since the transaction records of the Special Fund Raising Account do not indicate that a $25,000.00 deposit was made in 1980, the Court must conclude that there must have been another account and these funds were deposited into the second account.

The Court finds the government's argument unpersuasive for a number of reasons. First, the failure of the transaction records for the Special Fund Raising Account to indicate the existence of a $25,000.00 deposit does not necessarily mean that a second account existed. This omission could just as easily mean that the funds were not deposited until some time in 1981. Second, defendant Jeff Rode's own testimony reveals that he did not arrive in Salem, Oregon until October of 1980, several months after the commencement of the bingo operations. Furthermore, a review of his direct testimony indicates that the only bank account that he was aware of was the Special Fund Raising Account and that he had no knowledge of where the proceeds from the Portland bingo operation were deposited. Therefore, the Court finds that the testimony of Jeff Rode and the lack of a $25,000.00 deposit into the Special Fund Raising Account during 1980 does not establish that the defendants had two bank accounts during 1980.

Moreover, the Court finds that Jay Rode II was not a credible witness and his testimony was dubious. For example, at trial, this witness testified that he specifically remembered the seating capacity that the fire marshal established for the Salem bingo hall before it was remodeled sometime in late 1980 or early 1981. Yet, this wit-

ness, despite his apparent keen memory, could not remember the seating capacity of the bingo hall after the remodeling. Even more remarkable, though, was the inability of this witness to recall the address of any of his three former residences in Oregon. The inability to remember an address is obviously inconsistent with the ability to remember the specific seating capacity of a bingo hall several years after the hall was no longer in use. Due to the selective and inconsistent memory of this witness, the Court finds that his testimony lacks credibility.

Since there is a lack of any credible testimony before it to the contrary, the Court finds that the Special Fund Raising Account was the only account maintained by the Rodes during 1980. Consistent with that finding, the Court also finds that all bingo proceeds from both the Salem and Portland operations were deposited into this account.

In addition to rejecting the government's revised estimate of the defendants' 1980 bingo income for these reasons, the Court also rejects it because the evidence presented at trial suggests a means by which the 1980 net bingo revenue can be established in a manner that is more reasonable and objective than the way utilized by the government in its revised 1980 income assessment. It is this manner that the Court will use in determining the bingo revenue.

The starting point of the Court's calculation is Plaintiff's Exhibit 16. This exhibit consists of the "Pay Out Desk Tally Sheets" for three sessions at the Portland bingo hall. The three sessions were held on August 1, 1980, August 21, 1980 and an unknown date. This exhibit indicates that an average of 42.6 people were present at these three sessions. Although this sample is extremely small, it is the only evidence before the Court indicating the number of players per session in 1980 at either bingo hall. Moreover, the testimony given by various witnesses at trial indicates that the Salem bingo hall was averaging approximately forty players per session in August of 1980. Thus, this evidence is consistent with the testimony at trial that the Portland and Salem bingo operations experienced similar levels of patronage in 1980, a

position taken by the government in its proposed findings of fact, and the Court finds as such.

Furthermore, the Court also believes that these figures are significant for another reason as well. From the testimony at trial, the Court finds that both bingo operations experienced start up difficulties and that business improved at both bingos as 1980 progressed. Since the operations were started no later than March of 1980, the month of August approximately corresponds to the midpoint of the defendants' bingo operations in 1980. Using patronage figures from that month as an average for the entire year takes into account the growth experienced by the bingo operations in 1980 and compensates for the lower level of patronage experienced by the bingo halls in the spring of 1980 and the higher patronage levels they enjoyed towards the end of 1980.

The remaining information that the Court needs is also readily provided by testimony given at trial. The testimony of various witnesses at trial indicates that between five and ten sessions were held per week at both the Portland and Salem bingo halls. In accordance with this testimony, the Court will base its calculations on an average of eight sessions per week. A review of the testimony before the Court also indicates that the Portland bingo games began operation around the first of March and the Salem games in mid-February. Accordingly, the Court will assume in its calculation that the Portland games were operational for forty-four weeks and Salem bingo games were operational for forty-six weeks in 1980. The last piece of information needed by the Court is garnered from Agent Knight's testimony that the average net profit per player at the Salem bingo hall was $3.98 based upon the records he reviewed from the Salem Police Department. By using this figure for 1980, the Court makes the rational assumption that a similar level of profitability per player was enjoyed by the bingo operations in 1980.

When these figures are inserted into the following equation, the net bingo revenue

for 1980 is $122,074.56. The equation is as follows:

(total number of weeks of bingo operations)

× (average number of sessions per week)

× (average number of players per session)

× (average net profit per player per session).

When the values for these variables, as determined above by the Court, are inserted into this equation, the net revenue is:

[ (44—Portland) + (46—Salem) ] × (8) × (42.6) × ($3.98) = $122,074.56.

In further support of its finding that this amount is the most accurate representation of the net revenue, the Court notes that this figure is within a few dollars of the amount of deposits, $122,754.48, made into the Special Fund Raising Account in 1980, the account into which the Court has found all bingo proceeds where deposited in 1980.

In its proposed findings of fact, the government asserts that its initial decision to grant Jay and Judith Rode $87,436.00 in deductible expenses for the 1980 tax year was excessive. In support of its position, the government correctly asserts that the testimony of various witnesses indicates that the defendants used the Salem bingo hall as a residence as well as a business. Since personal living expenses are not deductible and the defendants did not establish at trial what portion of the Salem bingo hall was used as a residence and what portion was used for business purposes, the government maintains that the defendants should receive no deduction for the rent and utilities paid by them on the Salem bingo hall. In accordance with this position, the government, in its proposed findings of fact, has reduced the amount of deductions to which the defendants are entitled to $42,095.00.

Jay and Judith Rode through the testimony of Jack Rode and Jay Rode II, not through records or other receipts, assert in their proposed findings of fact that they are entitled to a deduction for the amounts spent by them in remodeling the Salem and Portland bingo halls. Like his brother Jay, the Court finds the testimony of Jack Rode

not to be credible and of no value. At trial, this witness had the remarkable ability to recall how much money was spent for remodeling and what items were purchased as part of the remodeling. Yet, when questioned on cross-examination about his own personal business, one started several years after the bingo hall was remodeled, the witness could not intelligently discuss its operations. Therefore, the Court finds that the testimony of Jack Rode lacks credibility due to its selective and inconsistent nature.

## 2. 1977 and 1978 TAX YEARS

The sole issues before the Court with respect to the 1977 and 1978 tax years relate to the disallowance of three deductions. They are as follows:

1. A claimed deduction of $30,278.00 on their 1977 return for charitable contributions.

2. A claimed deduction of $7,500.00 on their 1978 return for charitable contributions.

3. A claimed deduction of $34,373.00 on their 1978 return for expenses incurred with respect to rental property.

The IRS maintains that it disallowed each deduction due to the failure of Jay and Judith Rode to substantiate that they were entitled to the deduction.

At trial, they produced no credible evidence that would support their contention that they are entitled to these three deductions. There is a lack of documentary evidence that would buttress the position of the defendants. The only evidence that supports their contention is the testimony of Jay Rode II, he turned fifteen on October 19 of that year, who stated that during 1978 his father gave him rental checks for their Grand Rapids bingo halls of approximately $3,000.00 per month to deliver to the landlord. Given that the Court has found Jay Rode II not to be a credible witness, the Court finds this testimony to be of no value.

## 3. THE CONVEYANCE

As mentioned earlier by the Court, the government also seeks to set aside, as a fraudulent conveyance, the transfer of a farm located at 1566 Ten Mile Road, Sparta, Michigan from Jay and Judith Rode to their sons, defendants Jay Rode II, Jack Rode and Jeff Rode. The real estate in question actually consists of two adjacent parcels. The larger of the two parcels was acquired by Jay and Judith Rode in 1967 for $65,000.00 and the second parcel was purchased in 1978 for $10,000.00.

Defendant Jeff Rode testified at trial that he travelled from Michigan to Oregon for a vacation in July of 1980. When he returned to Michigan in August, his father and his brother, Jack, accompanied him. Subsequent to this trip, documents transferring the two parcels of land to Jay and Judith Rode's sons were recorded with the Kent County Registry of Deeds on October 16, 1980.

These documents indicate that the parcels of land where transferred to the sons on September 4, 1979. The testimony of Jeff Rode indicates that the documents were post-dated at the insistence of his father. Since the defendants, in their proposed findings of fact, do not challenge this testimony and there is no evidence to support a contrary finding, the Court finds that the transfer documents were post-dated and the transfer actually occurred in the late summer or early autumn of 1980.

As consideration, Jeff Rode testified that the brothers gave their parents one dollar and the 1980 apple crop which had a value of approximately $14,000.00.[5] They also assumed the outstanding land contracts on the property. Jeff Rode further testified that he has never made a payment on the land contract. Testimony was given that the brothers borrowed $95,000.00 dollars from the Universal Life Church on September 1, 1985 to pay off the balances of the outstanding land contracts on the real property and gave the church a mortgage and promissory note in return. However, neither the mortgage or the note was introduced at trial and no evidence was presented that payments had been made on the note by the brothers. Furthermore, the parties stipulated at trial that the mortgage had not been recorded with the Kent County Registry of Deeds.

Based upon this testimony, the Court finds the following. No payments were made by the sons on either the notes they assumed at the time the land was transferred to them or the note they supposedly received from the Universal Life Church. The only consideration given by the brothers for the farm was the 1980 apple crop.

In addition to these findings, the Court finds that the United States Tax Court had entered a decision against the defendants for tax years 1975 and 1976 on August 13, 1980. Also, prior to the transfer of the real property, the defendants had knowledge that the IRS was auditing tax returns they had filed in previous years.

## CONCLUSIONS OF LAW

### 1. 1980 TAX YEAR

■ The Court must first address whether the revenue generated from the bingo games should be considered part of Jay and Judith Rode's 1980 income. The evidence before the Court indicates that none of these proceeds were used for activities normally associated with religious institutions. The evidence also indicates that they exercised complete control over the bingo proceeds and that these proceeds were used for the personal needs of the Rode family. The Court concludes that the corporate entity, the Universal Life Church, should be disregarded and holds that the bingo proceeds are income to Jay and Judith Rode. *E.g., Lettinga v. Agristor Credit Corp.*, 686 F.2d 442, 446 (6th Cir.1982).

In an action to collect taxes, the government has the initial burden of proving that taxes are owed. This burden is usually met by means of an assessment. It has long been held that the Commissioner may

---

**5.** This figure is from the Schedule F filed by defendants Jay and Judith Rode as part of their 1980 income tax return.

estimate assessments by any reasonable method and such estimates will be accorded a presumption of correctness and will be overturned only if the taxpayer shows by a preponderance of the evidence that the assessment is erroneous. *E.g., Coleman v. United States*, 704 F.2d 326, 329 (6th Cir. 1983).

■ However, the mere fact that a taxpayer establishes that an assessment is incorrect does not relieve him of his tax obligation. Rather, unless the taxpayer proves that no deficiency exists, this Court is required to determine the correct figure. *E.g., Taylor v. Commissioner*, 445 F.2d 455, 460 (1st Cir.1971).

■ In the present case, Jay and Judith Rode, as the government readily concedes, have established that the assessment for tax year 1980 was erroneous. However, since they have not shown that no underreporting of income occurred and the Court has found the government's proposed revised figure to be excessive and not supported by a rational factual basis, the Court concludes that its figure, $122,074.56, is the amount of income received by them from their bingo operations in 1980.

■ The Court further concludes that Jay and Judith Rode are entitled to business deductions of $42,095.00. From the testimony at trial, it is rather obvious that the Rode family maintained the Salem bingo hall as both a residence and a business establishment. If a taxpayer uses his residence as his place of business, he is entitled to deduct only that portion of rent and similar expenses that are attributable to the place of business as a business expense. 26 U.S.C. § 262; 26 C.F.R. § 1.262–1(3). Moreover, the taxpayer bears the burden of establishing that he is entitled to a deduction. *Wolter Constr. Co. v. Commissioner*, 634 F.2d 1029, 1039 (6th Cir.1980). Since Jay and Judith Rode have presented no evidence to the Court establishing or even suggesting what portion of the Salem bingo hall was used for business purposes, the Court concludes that they are entitled to no deduction for expenses incurred at the Salem bingo hall.

■ Furthermore, the Court concludes that Jay and Judith Rode are not entitled to deduct the costs incurred in the renovation of the Portland and Salem bingo halls. No records or receipts were introduced that would establish the amount of money expended by them to renovate these halls. Moreover, as stated previously, the oral testimony of Jack Rode and Jay Rode II regarding these incurred expenses was not credible. Therefore, the Court concludes that they have not carried their burden of establishing that they are entitled to deduct these expenses. *Id.* Accordingly, the Court concludes that they realized a net profit of $79,979.56 from their bingo operations in 1980. The Court further concludes that this amount should have been included in their gross income for that tax year.

■ The Government also maintains that the $25,000.00 that Jay Rode received from the sale of some farm and tool and die equipment should be included in Jay and Judith Rode's 1980 income. The Court concludes that this position is without serious merit.

As a general rule, gains and losses from the sale of depreciable property used in a trade or business are to be included in the calculation of gross income. 26 U.S.C. § 1231(a). If the gains from such sales exceed losses, the gains and losses are to be treated as long-term capital gains or losses. *Id.* § 1231(a)(1). If losses exceed gains, the gains and losses are to be treated as ordinary gains and losses.[6] *Id.* § 1231(a)(2). Moreover, a gain occurs only when the property is sold for more than its adjusted basis and a loss occurs whenever depreciable property is sold for less than its adjusted basis. *Id.* § 1001.

In the present case, there is simply no evidence establishing how the sale of the questioned equipment should be treated. No testimony was given that would assist the Court in determining whether this sale was the only sale of depreciable property

6. With the implementation of the 1986 Tax Reform Act and its provisions taxing both capital gains and ordinary income at the same effective rate, this section of the Internal Revenue Code is, in effect, a relic from a previous era.

entered into by Jay and Judith Rode during tax year 1980. Moreover, assuming that this transaction was the only sale of such property during 1980, there is no evidence before the Court establishing the adjusted basis of the equipment at the time of its sale. Unless the Court is willing to engage in guess, speculation or conjecture, it cannot determine whether the Rodes realized a gain or a loss as a result of this sale. Accordingly, the Court concludes that the inclusion of this sale in their gross income for tax year 1980 would be improper and concludes that the defendants underreported their 1980 income by $79,979.56.

■ The government further maintains that Jay and Judith Rode's failure to include the bingo income in their 1980 income was the result of fraud. If the government proves, by clear and convincing evidence, that an underpayment of taxes is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment.[7] *Id.* §§ 6653(b), 7454(a).

A number of indicia of fraud have been relied on in internal revenue cases seeking the imposition of a fraud penalty. These indicia of fraud include:

(1) the taxpayer's failure to file tax returns;

(2) the taxpayer's failure to report income over an extended period of time;

(3) the taxpayer's failure to furnish the Government with access to his records;

(4) the taxpayer's failure to keep adequate books and records;

(5) the taxpayer's experience and knowledge, especially of the tax laws;

(6) the taxpayer's concealment of bank accounts from the IRS; and

(7) the taxpayer's willingness to defraud another in a business transaction.

*Solomon v. Commissioner*, 732 F.2d 1459, 1461-62 (6th Cir.1984).

The Court believes that a number of these indicia are present in this case. Jay and Judith Rode did not cooperate with the IRS during the course of its 1980 audit.

*See* 26 C.F.R. § 1.6001-1(e). From their complete reliance upon oral testimony at trial to substantiate their claimed deductions, it is rather obvious that they also failed to keep adequate books and records of their business activities. *See* 26 U.S.C. § 6001; 26 C.F.R. § 1.6001-1(a). Moreover, they received their bingo licenses in Michigan only because they made false and misleading representations to the Commissioner of Lottery. Furthermore, they operated their bingo games in Oregon under the guise of a number of churches with the intent of earning income for themselves.

From this evidence, there is undoubtedly clear and convincing proof that the taxpayers engaged in fraudulent behavior. Accordingly, the government may assess a fraud penalty of fifty percent to the taxes owed by Jay and Judith Rode as a result of their bingo activity.

### 2. 1977 and 1978 TAX YEARS

The sole issues before the Court with respect to the 1977 and 1978 tax years relate to the disallowance of three deductions. They are as follows:

1. A claimed deduction of $30,278.00 on their 1977 return for charitable contributions.

2. A claimed deduction of $7,500.00 on their 1978 return for charitable contributions.

3. A claimed deduction of $34,373.00 on their 1978 return for expenses incurred with respect to rental property.

The IRS maintains that it disallowed each deduction due to the failure of Jay and Judith Rode to substantiate that they were entitled to the deduction.

At trial, Jay and Judith Rode failed to establish that they made the claimed contributions or incurred the claimed expenses. They failed to introduce any records into evidence that would substantiate that they are entitled to deduct the expenses in-

---

7. Subsequent amendments to this section have increased the fraud penalty to 75%. Moreover, under these amendments, once the IRS has established that any portion of an underpayment is the result of fraud, the entire underpayment is attributed to fraud unless the taxpayer establishes otherwise. These provisions are now contained in Section 6663 of the Internal Revenue Code, not Section 6653(b).

curred with respect to the rental property. Rather, they presented only the discredited oral testimony of Jay Rode II. Furthermore, the Rodes also failed to present any evidence to the Court that would indicate that the alleged contributions qualify for a deduction under Section 170 of the Internal Revenue Code. 26 U.S.C. § 170.

It is a well settled principle of tax law that a taxpayer has the burden of establishing that he is entitled to a deduction. *Wolter*, 634 F.2d at 1039. Due to the failure of the Rodes to introduce at trial written records establishing both the existence of and the amount of these questioned expenditures, the Court concludes that they have not met this burden. Therefore, they have failed to prove that the assessments for tax years 1977 and 1978 are erroneous.

### 3. THE CONVEYANCE

■ For the plaintiff to prevail on the issue of whether the transfer of real property was a fraudulent conveyance, it must establish that the conveyance was fraudulent under state law. *Commissioner v. Stern*, 357 U.S. 39, 47, 78 S.Ct. 1047, 1052, 2 L.Ed.2d 1126 (1958). Michigan law provides that "every conveyance made and every obligation incurred with actual intent ... to hinder, delay or defraud either present or future creditors, is fraudulent as to both...." Mich.Comp.Laws Ann. § 566.17. The party seeking to have the transfer set aside must prove the existence of fraud by clear and convincing evidence. *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1165–66 (6th Cir. 1985); *Lackawanna Pants Mfg. Co. v. Wiseman*, 133 F.2d 482, 486 (6th Cir.1943); *Borock v. Bidlofsky (In re Bidlofsky)*, 57 B.R. 883, 893 (Bankr.E.D.Mich.1985).

■ By reason of its nature, it is usually very difficult to prove fraud by direct evidence and such proof is not required. *United States v. Leggett*, 292 F.2d 423, 426 (6th Cir.1961), *cert. denied*, 368 U.S. 914, 82 S.Ct. 194, 7 L.Ed.2d 131 (1961). Thus, the issue of fraud is commonly determined by certain recognized indicia. Although these indicia are not conclusive, the occurrence of several of them "will always make out a strong case." *Timmer v. Pietrzyk*, 272 Mich. 238, 242, 261 N.W. 313, 314 (1935).

■ In the present case, several indicia of fraud surround the transfer of the farm to the sons of Jack and Judith Rode. The transfer was between close family members and the sons gave only the 1980 apple crop as consideration for the farm. Moreover, the transfer documents recorded with the Kent County Registry of Deeds were backdated by over a year. Furthermore, all three of the Rodes' sons testified that the purpose of the transfer was to keep the farm in the family. Finally, at the time of the transfer, a judgment had been entered against the defendants by the U.S. Tax Court and they had been notified that the IRS would be auditing additional returns filed by them.

Accordingly, the Court concludes that the conveyance of the real property from defendants Jay and Judith Rode to their three sons was fraudulent as to the United States and is hereby set aside. Since the United States has federal tax liens on this property and there are outstanding tax assessments, the plaintiff may foreclose its liens.

### SUMMARY

In accordance with its findings of fact and conclusions of law, the Court concludes that defendants Jay and Judith Rode underreported their 1980 taxable income by $79,979.56 and that this underreporting was the result of their fraud. Furthermore, the Court concludes that Jay and Judith Rode have failed to establish that the tax assessments against them for tax years 1977 and 1978 are erroneous. Finally, the Court finds that the transfer of the real property located at 1566 Ten Mile Road, Sparta, Michigan by Jay and Judith Rode to their sons, defendants Jay Rode II, Jack Rode and Jeff Rode, was a fraudulent conveyance and that the United States may foreclose its outstanding tax liens on this property.