**In the Matter of LONG DEVELOPMENT, INC., Debtor.**

**OFFICIAL UNSECURED CREDITORS COMMITTEE OF LONG DEVELOPMENT, INC., Plaintiff,**

**v.**

**OAK PARK VILLAGE LIMITED PARTNERSHIP and Oak Park Village No. 2 Limited Partnership, jointly and severally, Defendants.**

**Bankruptcy No. 91–84522.
Adversary No. 93–8216.**

United States Bankruptcy Court,
W.D. Michigan.

Sept. 20, 1995.

Gary H. Cunningham, Kieran F. Cunningham, Bloomfield Hills, MI, for Plaintiff.

Ronald R. Sutton, Lansing, MI, for Defendants.

***OPINION REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S REMAINING CLAIMS***

JAMES D. GREGG, Bankruptcy Judge.

## I. ISSUES

Plaintiff, the Official Unsecured Creditors Committee ("Committee") has filed this adversary proceeding alleging that a certain state court settlement entered into between the Debtor, Long Development, Inc. ("Debtor") and the Defendants, Oak Park Village Limited Partnership and Oak Park Village No. 2 Limited Partnership ("Defendant Partnerships") constituted a fraudulent conveyance under various provisions of the Michigan Uniform Fraudulent Conveyance Act

("UFCA" or the "Act"). MICH. COMP. LAWS ANN. § 566.11 *et seq* (as incorporated into the Bankruptcy Code pursuant to 11 U.S.C. § 544). Specifically, the Committee claims that Debtor was insolvent at the time the Debtor entered into the settlement agreement with the Defendant Partnerships and that the release obtained from the Partnerships did not amount to "fair consideration" to justify the settlement payment terms. The Committee also claims that the settlement agreement was made with the purpose to "hinder, delay and defraud" the Debtor's other creditors and therefore the payments made, or to be made, under the agreement are voidable and recoverable.

The Defendant Partnerships have moved for summary judgment pursuant to Rule 7056(c) of the Federal Rules of Bankruptcy Procedure which makes applicable Rule 56(c) of the Federal Rules of Civil Procedure. The Defendants' summary judgment motion raises two basic issues. First, did the transfer of assets and assignment of rights from the Debtor to the Defendant Partnerships pursuant to the settlement agreement amount to a "constructive fraud" under Sections 4, 5 and 6 of the UFCA? MICH. COMP. LAWS ANN. § 566.14–16. Second, was the settlement agreement made with the actual intent to hinder, delay and defraud other creditors so that it would be viewed as an "actual fraud" under Section 7 of the UFCA? MICH. COMP. LAWS ANN. § 566.17.

## II. JURISDICTION

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H), and (O). To the extent this matter may be a noncore, related proceeding all parties have consented, pursuant to 28 U.S.C. § 157(c)(2), to this court hearing the proceeding and rendering a final judgment or order subject to appellate review pursuant to 28 U.S.C. § 158. *See* Stipulation and Order Re Jurisdiction, Docket # 32,; Second Pretrial Order, Docket # 34.

## III. FACTS AND PROCEDURAL BACKGROUND [1]

The controversy underlying this adversary proceeding began more than ten years ago with the sale of the Oak Park Village Apartments (the "Apartments") to the Debtor. The Partnerships, of which Gordon Long ("Long") was the general partner at the time of the sale to the Debtor, developed and operated the Apartments. *See* First Amended Complaint (the "Amended Complaint"), paragraph 5 at 2, paragraph 9B and 9C at 3; Defendant's [sic] Answer to Plaintiff's First Amended Complaint (the "Answer"), paragraph 5 at 2, paragraph 9 at 3; *see also* Trial Brief of the Defendants Oak Park Village Limited Partnership and Oak Park Village No. 2 Limited Partnership ("Defendants' Brief") at 2. On August 30, 1983, the Partnerships, through their general partner Long, sold the Apartments to the Debtor for $14,913,951.80. Plaintiff's Trial Brief on Issues of: (1) Assignment, (2) Perfection and (3) Avoidance ("Plaintiff's Brief") at 2–3; Defendants' Brief at 2; Joint Exhibit R12. Long was the majority shareholder and president of the Debtor. Amended Complaint, paragraph 9A at 3; Answer, paragraph 9 at 3; Defendants' Brief at 2. Of the $14,913,951.80 purchase price, $11,913,951.80 was allocated to the Debtor's assumption of mortgages on the Apartments. Joint Exhibit R12. The Debtor agreed to pay the $3 million balance in cash to the Partnerships, which received more than $2.7 million in cash after deduction of closing costs. Plaintiff's Brief at 3; Defendants' Brief at 2.

**1.** The general background facts which gave rise to this adversary proceeding have already been determined by this court in its previous opinion of August 22, 1994. *See Opinion Regarding Partial Assignment of Debtor's Interest in Promissory (Wrap) Notes* (August 22, 1994). Some of the court's factual findings as set forth in its prior opinion are restated herein; however, the footnotes have been omitted. Accordingly, unless otherwise indicated, all citations to "Trial Briefs" and "Joint Exhibits" refer to the pleadings and exhibits submitted by the parties in connection with the hearing held on May 19, 1994.

On *the same day*, August 30, 1983, the Debtor almost immediately resold the Apartments to Oak Park–Oxford Associates Limited Partnerships ("Oxford"). In consideration for its sale of the Apartments to Oxford, the Debtor received $1,692,111.06 in cash and two Wrap Notes in the principal amounts of $10,650,000 and $4,350,000. *See* Joint Exhibits B, S2, S3; Plaintiff's Brief at 3.

On September 27, 1984, the Partnerships filed suit against Long and the Debtor in Clinton County Circuit Court (the "state court litigation"). The Partnerships alleged that Long had breached his fiduciary duties to the Partnerships' limited partners by failing to inform them of the "far superior opportunity presented by the sale of [the Apartments] to Oak Park–Oxford Associates Limited Partnership...." Joint Exhibit K at 8. The Partnerships claimed that the price paid to the Debtor by Oxford exceeded by approximately $5.8 million the price that the Debtor had paid to the Partnerships for the Apartments. Joint Exhibit K at 8–9. In effect, the issue in the state court litigation was whether the Debtor and Long had stolen a profit that belonged to the Partnerships.

On December 21, 1987, the Clinton County Circuit Court for the State of Michigan granted summary disposition against Long and the Debtor on the issue of liability. That court held "as a matter of law that Defendant Long did breach his fiduciary duty to Plaintiffs by not advising them of the interest of the Oxford Group in the Partnership Property." Joint Exhibit P. The court further ordered that a trial be held as to the amount of damages Long and the Debtor owed to the Partnerships.

Prior to trial, the parties to the state court litigation settled the damages issue. Under the terms of the Release and Settlement Agreement (the "Settlement Agreement"), executed on December 7, 1988, the Debtor agreed to make the following cash payments to the Partnerships: (1) $50,000 by December 20, 1988; (2) $50,000 by January 15, 1989; and (3) $150,000 by April 1, 1989. Joint Exhibits E, paragraph 1 at 2. Second, the Debtor agreed to "assign a portion of its right, title and interest in and to the Wrap Notes...." *Id.*, paragraph 2 at 3. Finally, Long agreed to guarantee the obligations assumed by the Debtor under the terms of the Settlement Agreement. *Id.*, paragraph 3 at 5. In exchange for these payments, the Partnerships agreed to dismiss the lawsuit against Long and the Debtor. *Id.*, paragraph 6 at 10. In addition, except as provided for by the Settlement Agreement, the Partnerships agreed to release and discharge Long and the Debtor from all claims and causes of action "which were known or should have been known by the parties relating in any manner to or arising from or which could have arisen from the Lawsuit...." *Id.*, paragraph 10 at 12.

Also on December 7, 1988, the Debtor and the Partnerships entered into the Assignment. Joint Exhibit F. In order to carry out the terms of the Settlement Agreement, the Debtor assigned to the Partnerships a portion of the future payments due under paragraphs (b)(iii)(B) and (c) of the Wrap Notes. *Id.* at 2.

On August 22, 1991, the Debtor filed for relief under chapter 11 of the Bankruptcy Code. On April 6, 1993, the Committee filed the instant adversary proceeding, essentially claiming that the portion of the Wrap Note payments transferred to the Partnerships under the terms of the Assignment were property of the Debtor's estate under 11 U.S.C. § 541. *See* Amended Complaint. The Committee asserted that, at best, the Debtor had merely granted a security interest in the Wrap Note payments to the Partnerships and that the Partnerships had failed to properly perfect their security interest in those Wrap Note payments. *Id.* In its Amended Complaint, the Committee also claimed that the assignment of the Wrap Note payments constituted a fraudulent conveyance. This court agreed to reserve judgment on the fraudulent conveyance issue pending an initial determination of the questions relating to the validity of the assignment and the perfection for the security interest.

This court held a trial on the assignment and perfection issues on May 19, 1994. The Committee and the Partnerships submitted Joint Exhibits A through W into evidence. In addition, three witnesses testified: (1) Jeffrey Dale Kegler, the vice president and controller of the Debtor; (2) Wendy Zabriskie, who previously worked as a commercial loan officer for Michigan National Bank ("MNB"), the collection agent for the Wrap Notes; and (3) Jay Hansen, an employee of Independence One Mortgage Corporation, a wholly owned subsidiary of MNB. *See* Transcript of May 19, 1994 trial ("Transcript").

After a day-long trial, the court took the matter under advisement and on August 22, 1994, this court issued its written opinion in which it concluded that the Committee had standing to pursue this adversary proceeding. More importantly, this court found that the Debtor had validly assigned an ownership interest in a portion of the Wrap–Around Promissory Notes ("Wrap Notes") to the Defendant Partnerships pursuant to the settlement agreement between the Debtor and the Defendant Partnerships. *See Opinion Regarding Partial Assignment of Debtor's Interest in Promissory (Wrap) Notes* (August 22, 1994).

Following the court's earlier opinion, another trial was scheduled regarding the Plaintiff's fraudulent conveyance claims. On July 21, 1995, the Defendant Partnerships filed the instant Motion for Summary Judgment seeking dismissal of the Plaintiff's remaining claims. The parties submitted written briefs and a hearing on the motion was held before this court on August 14, 1995.

## IV. DISCUSSION

### A. *Standards for Summary Judgment*

Rule 7056 of the Federal Rules of Bankruptcy Procedure adopts the standard for summary judgment set forth in Rule 56 of the Federal Rules of Civil Procedure which provides in part:

> The judgment sought shall be rendered forthwith if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

FED.R.CIV. P. 56(c).

In other words, summary judgment is appropriate only where no genuine issue of fact remains to be decided so that the moving party is entitled to judgment as a matter of law. *Historic Preservation Guild v. Burnley*, 896 F.2d 985 (6th Cir.1989). Both the United States Supreme Court and the United States Court of Appeals for the Sixth Circuit have encouraged the use of summary judgments where appropriate. *Historic Preservation*, 896 F.2d at 993 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). These appellate courts have noted that the summary judgment motion may be an "appropriate avenue for the 'just, speedy and inexpensive determination' of a matter." *Cloverdale Equipment Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir.1989) (*quoting Celotex*, 477 U.S. at 327, 106 S.Ct. at 2554–55).

The party moving for summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the record which demonstrate the absence of a material issue of fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53. Once the moving party has met its initial burden, the nonmoving party must come forward with specific facts showing that there is a genuine issue of material fact on which the nonmoving party will bear the burden of proof at trial. FED.R.CIV.P. 56(e); *Celotex*, 477 U.S. at 322–24, 106 S.Ct. at 2552–53. If after adequate discovery the party bearing the burden of proof fails to make a showing sufficient to establish an essential element of his claim, summary judgment is appropriate. *Id.*

A motion for summary judgment requires this court to view " 'inferences to be drawn

from the underlying facts ... in the light most favorable to the party opposing the motion.'" *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). On the other hand, the opponent has the burden to show that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'" *Historic Preservation*, 896 F.2d at 993 (*quoting Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356). No genuine issue of material fact exists unless, in viewing the evidence in favor of the non-moving party, a reasonable fact finder could return a verdict for that party. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249, 106 S.Ct. at 2511 (citations omitted). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." *Id.* at 252, 106 S.Ct. at 2512. The non-moving party is required to do more than simply show that there is some "metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106. S.Ct. at 1356. "Mere allegations are insufficient. The party with the burden of proof must provide concrete evidence in support of a claim and thereby demonstrate the existence of a genuine issue of material fact." *Cloverdale*, 869 F.2d at 937.

### B. *Michigan Uniform Fraudulent Conveyance Act*

Plaintiff claims that the settlement agreement between Debtor and Defendant Partnerships amounted to a fraudulent conveyance under Sections 4 through 7 of the UFCA and therefore may be set aside pursuant to 11 U.S.C. § 544(b) which incorporates Michigan's fraudulent conveyance law into the Bankruptcy Code. Sections 4, 5 and 6 of the UFCA involve "constructive fraud" whereby a person who is at, or near, insolvency transfers assets to a third party without receiving "fair consideration." In contrast, Section 7 of the UFCA pertains to cases of "actual fraud" where the debtor transfers assets with the intent to "hinder, delay or defraud" other creditors. The Plaintiff contends that the settlement agreement and subsequent transfer of property rights from the Debtor to the Defendant Partnerships were made without adequate consideration and therefore amounts to a constructive fraud. Alternatively, Plaintiff contends that the settlement agreement was intended to defraud the Debtor's other creditors and therefore constituted an actual fraud. Each of these theories is discussed separately below.

### 1. *Constructive Fraud*

In support of its claims of constructive fraud, Plaintiff alleges that the Debtor was at or below the point of insolvency when it Entered into the settlement whereby it agreed to transfer approximately $3.1 million in cash and future payments to the Defendant Partnerships in exchange for a release from the Partnerships' claim seeking $5.8 million in damages against the Debtor. Plaintiff argues that Partnerships' claim against the Debtor was basically worthless because the Debtor was insolvent and uncollectible. Thus, Plaintiff contends that the release obtained by Debtor "was of virtually no real value to the Debtor," regardless of the merits of the Partnerships' claims. *See* Plaintiff's Answer In Opposition to Defendants' Motion for Summary Judgment, p. 12. Plaintiff further argues that the settlement was not made in "good faith" because the Partnerships knew that the Debtor was on the verge of bankruptcy and therefore were willing to settle for approximately 50% of their claims before the Debtor's other creditors could assert their claims against the Debtor's assets.

Sections 4 through 6 of the UFCA set forth those situations wherein a fraudulent conveyance may be found or inferred without proof of actual fraudulent intent. Those statutes provide as follows:

#### 566.14 Conveyance by insolvent

Sec. 4. Every conveyance made and every obligation incurred by a person who is

or will be thereby rendered *insolvent* is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred *without fair consideration.*

#### 566.15 Conveyances by persons in business

Sec. 5. Every conveyance made *without fair consideration* when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an *unreasonably small capital,* is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

#### 566.16 Conveyances by a person about to incur debts

Sec. 6. Every conveyance made and every obligation incurred *without fair consideration* when the person making the conveyance or entering into the obligation intends or believes that he *will incur debts beyond his ability to pay* as they mature, is fraudulent as to both present and future creditors.

MICH. COMP. LAWS ANN. §§ 566.14–16 (emphasis added).

■ Thus, in order to set aside a transfer as a fraudulent conveyance under a constructive fraud theory, *two* basic elements must each be established under Sections 4 through 6 of the UFCA. First, it must be shown that the transfer was made "without fair consideration." This identical phrase appears in each section. Second, the person making the transfer must be at or near the point of insolvency at the time the transfer is made. This second element, pertaining to the actual or potential insolvency of the debtor, is described differently in each of the above sections. However, the Plaintiff has argued that all three statutory sections are applicable to the payments made under the Settlement Agreement between the Debtor and the Defendant Partnerships. Therefore, Sections 4 through 6 will be analyzed together for purposes of this opinion.

#### a. *Insolvency of Debtor*

Plaintiff asserts that "[a]t the time of the Agreement and the assignment of the Wrap Notes, in December 1988, the available testimony from Plaintiff's accounting experts will demonstrate that the Debtor was seriously, if not terminally, insolvent." *See* Plaintiff's Brief in Opposition, p. 4. In further support of this allegation, Plaintiff has filed a Supplemental Brief which includes affidavits from two expert witnesses. First, Terrell R. Oetzel has opined that "the present fair saleable value of the Debtor's interests in real estate was less than the amount of the mortgage of indebtedness owing by the Debtor to its secured creditors." *See* Affidavit of Terrell R. Oetzel, p. 2, ¶ 4 (August 11, 1995). Likewise, Elmor E. Heupel expresses his agreement with Mr. Oetzel's opinion that the Debtor was insolvent at the time it entered into the Settlement Agreement with the Defendant Partnerships on December 7, 1995. *See* Affidavit of Elmor E. Heupel (August 11, 1995).[2]

In moving for summary judgment, the Defendant Partnerships have not seriously contested the assertion that the Debtor was insolvent at the time it entered into the Settlement Agreement. Indeed, at the hearing on the motion, defense counsel basically conceded this point for purposes of determining whether summary judgment is appropriate. Instead, the Partnerships have argued that the Settlement Agreement was supported by "fair consideration" regardless of whether or not the Debtor was insolvent. Accordingly, for the limited purpose of ruling on the instant motion for summary judgment, this court will draw the inference in favor of the nonmoving party and assume that the Debtor was insolvent at the time of the Set-

2. Furthermore, Mr. Heupel states in his affidavit, "It is also my expert opinion that the Debtor did not receive reasonably equivalent value or fair consideration from the Defendants in exchange for its transfer of the Wrap Notes on December 7, 1988." *Id.* at p. 2, ¶ 6. This is a legal conclusion which is addressed in the following section of this opinion.

tlement Agreement. Thus, the determinative issue is whether or not the release given by the Defendant Partnerships amounted to "fair consideration" within the meaning of Sections 4, 5 and 6 of the UFCA.

### b. *Fair Consideration*

■ As the party challenging the transaction, the burden is on the Plaintiff to establish that the Debtor did not receive "fair consideration." *See generally Mason v. Mason*, 296 Mich. 622, 626, 296 N.W. 703 (1941). Section 3 of the UFCA provides the following examples of what constitutes "fair consideration" within the meaning of the Act:

**566.13 Fair consideration**

Sec. 3. Fair consideration is given for property, or obligation:

(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

(b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained.

MICH. COMP. LAWS ANN. § 566.13

As has been noted by other courts, "Section 3 of the UFCA is the source of a fair amount of confusion." *Webster v. Barbara (In re Otis & Edwards, P.C.)*, 115 B.R. 900, 907 (Bankr.E.D.Mich.1990). For instance, the phrase "fair equivalent" which appears in subsection (a) is basically synonymous with "fair consideration", thereby resulting in a circular definition. Likewise, the phrase

"not disproportionately small" which appears in subsection (b) is equally vague. Moreover, both subsections (a) and (b) imply a "good faith" requirement, which suggests a lack of fraudulent intent—even though intent is not necessary to prove constructive fraud.

Given the lack of guidance from the statutory language, courts have struggled to define the meaning of "fair consideration." The same problem is encountered in attempting to define the phrase "reasonably equivalent value" which appears in the fraudulent conveyance section of the United States Bankruptcy Code. *See* 11 U.S.C. § 548. *See also In re Otis & Edwards*, 115 B.R. at 908 (the phrase "fair consideration" as used in the UFCA is basically synonymous with "reasonably equivalent value" in Section 548 of the Code).

In searching for a definition, some courts have adopted a subjective test which focuses on the fairness aspect. Under this approach, the consideration is presumed "fair" so long as it is not "so far short of the real value of the property as to startle a correct mind or shock the moral sense." *Mancuso v. Champion (In re Dondi Financial Corp.)*, 119 B.R. 106 (Bankr.N.D.Tex.1990).[3] In contrast to the subjective "fairness" test, other courts have attempted to apply a precise mathematical formula whereby any transfer for less than 70% of the market value of the property is *per se* not reasonably equivalent value. *See Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201 (5th Cir.1980). However, most courts have rejected this rigid test as being overly mechanical. *See, e.g., Bundles v. Baker (In re Bundles)*, 856 F.2d 815, 823–24 (7th Cir.1988).[4]

■ In several recent cases decided under Michigan law, courts have looked to the "to-

---

3. The subjective test set forth in the *Dondi* opinion is reminiscent of the famous phrase, "I know it when I see it," used by Justice Stewart in attempting to define pornography, and is equally instructive. *See Jacobellis v. State of Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring).

4. Both *Durrett* and *Bundles* involved challenges to foreclosure sales under the fraudulent conveyance provision contained in the Bankruptcy Code which allows the trustee to avoid transfers made within one year prior to filing, if the debtor made

the transfer to "hinder, delay or defraud" creditors or the debtor received less than "reasonably equivalent value in exchange." 11 U.S.C. § 548. The United States Supreme Court has resolved this conflict between *Durrett* and *Bundles* by ruling that the price received at the foreclosure sale will be deemed to be a reasonably equivalent value for the foreclosed property so long as the sale was conducted properly in accordance with the applicable state law. *See BFP v. Resolution Trust Corporation*, 511 U.S. 531, 544–46, 114 S.Ct. 1757, 1765, 128 L.Ed.2d 556 (1994). *See*

tality of circumstances" surrounding the transaction to determine whether "fair consideration" or "reasonably equivalent value" is given in exchange for a transfer of property. *See Allard v. Hilton (In re Chomakos)*, 170 B.R. 585, 593 (Bankr.E.D.Mich.1993); *Boyd v. Sachs (In re Auto Specialties Manufacturing Company)*, 153 B.R. 457, 498 (Bankr.W.D.Mich.1993); *Webster v. Barbara (In re Otis & Edwards, P.C.)*, 115 B.R. 900, 909 (Bankr.E.D.Mich.1990). These courts have considered some or all of the following factors to determine whether the "fair consideration" requirement has been met under the UFCA:

(1) whether the transaction was conducted at arms-length;

(2) was property or value transferred to the debtor;

(3) whether the debtor received additional valuable benefits as a result of the transaction;

(4) whether the debtor has been rendered "execution proof;" and

(5) was the transaction made in "good faith."

*See supra, In re Chomakos*, 170 B.R. at 593–94; *In re Auto Specialties*, 153 B.R. at 498; *In re Otis & Edwards*, 115 B.R. at 909. This court determines that, applying Michigan fraudulent conveyance law, these factors are appropriate and governing. The party seeking to set aside the transfer bears the burden of proving the transferors failed to receive "fair consideration." *In re Chomakos*, 170 B.R. at 590 (citing *In re Otis & Edwards*, 115 B.R. at 907).

### (1) *Arms–Length Transaction*

■ In the instant case, it is apparent that the Settlement Agreement between Debtor and the Defendant Partnerships was "conducted at arms-length." As noted in the Plaintiff's Brief in Opposition, the Debtor

and the Defendant Partnerships had engaged in four years of "highly contentious litigation" prior to entering into the settlement in 1988. *See* Plaintiff's Brief in Opposition, p. 4. The litigation had resulted in a partial summary judgment against the Debtor and its principal officer, Long, who had served as the General Partner of the Defendant Partnerships. "Indeed, with respect to the Defendant Partnerships themselves, Long so egregiously breached his fiduciary duties to said partnerships that he was found liable as a matter of law on a motion alone." *Id.* at p. 19. Given the extremely contentious relationship between the Debtor and the Defendant Partnerships, any reasonable fact-finder would conclude that the eventual settlement was conducted at "arms-length." This factor heavily weighs in favor of finding that the settlement agreement was supported by "fair consideration."

### (2) *Value Transferred to the Debtor*

Another central issue in this proceeding is whether the release of liability obtained by the Debtor was of sufficient value to justify the total payments of approximately $3.1 million to the Defendant Partnerships in settlement of their claims. As noted above, the Debtor did not agree to settle with the Defendant Partnerships until after the Clinton County Circuit Court had entered summary judgment in favor of the Partnerships finding the Debtor and its President, Long, liable for misappropriating the profit on the sale of the Apartments which rightfully belonged to the Defendant Partnerships. The Partnerships sought damages from Long and the Debtor in the amount of $5.8 million. However, prior to trial, the Partnerships agreed to a compromise settlement under which they received approximately $3.1 million consisting of $250,000 in cash payments and an assignment of rights to future payments under the Wrap Notes.

In arguing that the settlement amounted to a fraudulent conveyance, Plaintiff claims

*also Lindsay v. Beneficial Reinsurance Co. (In re Lindsay)*, 59 F.3d 942, 947–48 (9th Cir.1995) (recognizing the abrogation of both *Durrett* and *Bundles* ). The instant case involves a challenge

to a settlement agreement, as opposed to a foreclosure sale. Therefore, the Supreme Court's ruling in *BFP* does not apply.

883

that the "settlement of the Clinton County litigation had virtually no real value to the Debtor...." *See* Plaintiff's Brief in Opposition, p. 12. However, it is undisputed that at the time of the Settlement Agreement, there had already been a judicial determination of liability on the part of the Debtor. Moreover, at the hearing on the instant motion, counsel for the Plaintiff Creditors' Committee conceded that Long and the Debtor had made a "profit" of approximately $5 million dollars on the resale of the Apartments. *See* Transcript of Hearing (8/14/95), p. 33, lines 5–14. The Clinton County Circuit Court had concluded that the profit on the resale of the Apartments rightfully belonged to the Partnerships. Therefore, if the case had proceeded to trial on damages, it appears that the Partnerships would have won at least $5 million on their claim for $5.8 million in damages.

Thus, under the terms of the Settlement Agreement, the Debtor paid a total of $3.1 million to the Partnerships in exchange for a release from a potential judgment of liability of at least $5 million. In other words, under the compromise settlement, the Debtor was able to discharge a potential liability of at least $5 million by paying approximately 60 cents on the dollar over a period of several years. Any rational trier of fact would conclude that value was transferred by the settlement agreement.

Nevertheless, Plaintiff still maintains that Debtor did not receive any "real value" from the release of liability because the Debtor was allegedly insolvent at the time of the settlement. The thrust of Plaintiff's argument is that the potential $5.8 million judgment against an insolvent party was worthless and, thus, the release from that worthless claim was similarly without value. However, Plaintiff also concedes that at the time of the Settlement, the Debtor's real estate holdings were worth at least $25 million, not to mention the additional payments owed to Debtor under the Wrap Notes. *See* Plaintiff's Brief in Opposition, p. 4. Even if

we view the facts in the light most favorable to the Plaintiff and assume that the Debtor's liabilities were in excess of its assets at the time of the settlement, it remains apparent that the Debtor was in control of substantial assets which the Partnerships could have promptly pursued in satisfaction of any final judgment against the Debtor.

In their Reply Brief, the Partnerships argue that had they pursued their claims to judgment, they could have obtained a constructive trust over the proceeds due under the Wrap Notes and thereby secured payment for their entire claim of $5.8 million. In response, the Plaintiff cites to the recent case of *In re Advent Management Corporation*, 178 B.R. 480 (9th Cir. BAP 1995) in which the United States Bankruptcy Appellate Panel of the Ninth Circuit refused to recognize the existence of a constructive trust absent a prior judicial determination establishing the existence of such a trust.

For purposes of the instant summary judgment motion, it is not necessary for this court to speculate as to whether or not the Partnerships could have secured a constructive trust over the proceeds of the Wrap Notes.[5] Nor is it necessary to estimate the precise amount that the Partnerships could have eventually realized in satisfaction of a judgment against the Debtor through the attachment of property, garnishment, or other means of collection. Rather, the question is whether the release of a $5.8 million claim was of value to the Debtor. In view of the undisputed fact that there had already been a judicial determination of liability against the Debtor and in light of the concession by Plaintiff's counsel that the Partnership would have been awarded at least $5 million at trial, it is obvious that a release of these claims was of value to the Debtor—even if the Debtor was insolvent at the time of the settlement.

 Plaintiff does not dispute the essential facts that Debtor was liable to the Partnerships and that the debt was at least $5

5. Although not necessary to this court's decision, the facts before the state trial court are a classic example of why the equitable remedy of a constructive trust was developed.

million dollars. Rather, Plaintiff complains that Debtor chose to settle with the Partnerships rather than using the proceeds from the Wrap Notes to pay its other creditors represented by the Plaintiff Committee. However, under Michigan law, it is well established that an insolvent debtor may prefer one creditor over another so long as the payment is substantially equivalent in value to a bona fide claim made by the creditor:

> The important inquiries are whether the ex-wife made a *bona fide* claim against her former husband, whether it was substantially equivalent in value to the property conveyed satisfaction thereof and whether the transfer was an actual and not a colorable transaction. . . . Preferences are not fraudulent even though the preferential conveyance is made, provided that the discharged antecedent debt is substantially equivalent in amount to the value of the transferred property.

*Hartsema v. Addison Coal & Coke Co.*, 286 Mich. 296, 302–303, 282 N.W. 155 (1938) (citations omitted). *See also Berger Furnace Co. v. Collins*, 354 Mich. 289, 295, 92 N.W.2d 338 (1958) ("Is the settled law of this State, that, laying aside the Federal Bankruptcy Act, a debtor may prefer one creditor to another"); *Mason v. Mason*, 296 Mich. 622, 627, 296 N.W. 703 (1941) ("There is no question that in this State a debtor can prefer one creditor to another, although at the time of such preference, the debtor may be insolvent; but such preference will not be fraudulent on that account.") (citations omitted). Thus, even assuming that the Debtor was insolvent at the time it entered into the Settlement Agreement, this fact alone would not make the payment under the Agreement a fraudulent conveyance, even if it meant that the Debtor would not be able to satisfy all of its other creditors.

Furthermore, if the Plaintiff's argument were taken to its logical conclusion, then virtually any and every payment made by an insolvent. debtor would be deemed a fraudulent conveyance, because, by definition, the debtor's liabilities exceed its assets and therefore, there is a risk that the creditor will not be able to collect the entire amount owed through judicial proceedings. The law does not support such a conclusion. Insolvency is only one element of constructive fraud under Sections 4 though 6 of the UFCA. The Plaintiff must also prove lack of "fair consideration." In the instant case, the Debtor was able to obtain a release of a claim which was worth at least $5 million by paying approximately $3.1 million to the Defendant Partnerships. This release was of "real value" to the Debtor which supports the conclusion that there was "fair consideration."

### (3) *Additional Benefits to the Debtor*

Another factor to be considered is whether the Debtor received additional valuable benefits as a result of the transaction. *See, e.g., In re Chomakos*, 170 B.R. at 594. In the instant case, Plaintiff notes that as part of the Settlement Agreement, the Defendant Partnerships agreed to release both the Debtor and its President, Gordon Long. Plaintiff further contends that Long's liability to the Partnerships was based on his breach of fiduciary duty and therefore would have been non-dischargeable in any future personal bankruptcy proceedings. Thus, Plaintiff concludes that the Settlement was a "grossly improper and bad faith disposal of a corporate asset for personal insulation." *See* Plaintiff's Brief in Opposition, p. 14.

Viewing the facts in the light most favorable to the Plaintiff, it can be easily inferred that the Debtor's President, Long, was motivated to settle with the Partnerships, at least in part, by the promise to release Long from personal liability. Indeed, it seems highly unlikely that Long would have entered into a Settlement Agreement absent such a release. However, for purposes of this analysis, the fact that the Partnerships agreed to release the Debtor's chief executive officer from personal liability does not effect the legitimacy of the settlement with the Debtor itself.

The fact remains that the Debtor was able to settle a potential $5 million judgment for only $3.1 million. Although Long may have received an "additional benefit" by obtaining a release from personal liability, this does not

impair the value of the settlement to either the Debtor or to the Partnerships. (After all, the Debtor itself was the party which received the benefit of Long's theft of the Defendant Partnerships' business opportunity profit.) Nor is there any evidence to suggest that Long was able to divert any of the payments made by the corporate Debtor to the Defendant Partnerships under the Settlement Agreement. Had there been some evidence of "kick-backs" paid to Long, it might become a material factor. However, there is no such evidence in this case.

### (4) *"Execution Proof"*

Another factor considered by some courts in determining the existence of "fair consideration" is whether the alleged fraudulent conveyance rendered the debtor "execution proof." *See, e.g., In re Auto Specialties,* 153 B.R. at 498. In discussing the confusion surrounding the concept of "fair consideration," Judge Graves posed the rhetorical question, "What does rendering the debtor 'execution proof' mean?" *See In re Otis & Edwards,* 115 B.R. at 907, n. 39. While Judge Graves did not provide an answer to this question, he nevertheless included the issue as one of the factors to be considered when analyzing whether fair consideration is present. *Id.* at 910.

Assuming that the factor is relevant, there is no evidence in the record which would demonstrate that the Debtor was rendered "execution proof" by entering into the Settlement Agreement with the Defendant Partnerships. For purposes of this motion, it is assumed that the Debtor was "insolvent" at the time of the settlement; however, "insolvency" is not necessarily synonymous with "execution proof." To the contrary, the Debtor possessed substantial interests in real estate and the right to future payments under the Wrap Notes. Whether or not the Partnerships could have collected the entire amount of its $5.8 million claim from the Debtor's assets is problematic. However, there is no showing that the $3.1 million settlement with the Partnerships depleted the Debtor's assets to the point that the Debtor was "execution proof." Indeed, as-suming that the Debtor was "insolvent" it still had sufficient assets to continue operations for almost three years prior to the bankruptcy filing in August of 1991. Certainly, there is no evidence to suggest that the Debtor was trying to divest itself of assets in order to make itself "execution proof." Thus, to the extent that it is relevant, this factor does not weigh in favor of finding a fraudulent conveyance.

### (5) *"Good Faith" Transaction*

As noted above, the statutory definition of "fair consideration" includes reference to the phrase "good faith." *See supra,* MICH. COMP. LAWS ANN. § 566.13. In *In re Otis & Edwards,* the court concluded that the issue of good faith should be analyzed separate from the question of "fair equivalence." *In re Otis & Edwards,* 115 B.R. at 910. Relying on various commentators, Judge Graves opined that issue of "good-faith" should focus on the intent of the *transferee,* rather than the debtor. *Id.* at n. 51 (citing *inter alia,* Note, *Good Faith and Fraudulent Conveyances,* 97 Harv. L.Rev. 495 (1993)). If the transferee was intentionally aiding the Debtor's fraudulent scheme, then a finding of bad faith will be inferred. However, "the transferee who does no more than protect an already existing claim is considered to have acted in good faith, even if the transferee has knowledge of the debtor's condition or fraudulent intent." *In re Otis & Edwards,* 115 B.R. at 910. Thus, the court concluded that "more than mere knowledge of the debtor's financial situation or fraudulent intent is required to find a lack of good faith." *Id.*

■ Rather than analyzing the issue of good faith separately, Judge Shapero included "good faith" as one of the factors used to determine the adequacy of the consideration under the "totality of circumstances" test. *In re Chomakos,* 170 B.R. at 593–595. Regardless of whether it is treated as a separate issue, or as one of several factors, the issue of "good faith" still relates to the intent of the *transferee.* "The primary orientation on this point is whether the *transferee* knowingly participated in acts or as part of a plan

to hinder or defraud creditors." *Id.* at 594 (emphasis added).

In the instant case, Plaintiff has presented no evidence to suggest that the Defendant Partnerships knew that the settlement agreement would eventually render the Debtor insolvent. However, even if this knowledge could be inferred, it still would not be enough to establish a lack of "good faith" on the part of the Partnerships. Rather, by agreeing to enter into a compromise settlement, the Partnerships were simply acting to "protect an already existing claim" against the Debtor. *See supra, In re Otis & Edwards*, 115 B.R. at 910. Thus, absent a showing of fraudulent intent on the part of the Defendant Partnerships, the Settlement Agreement with the Debtor was not made in bad faith, even assuming that the Partnerships were aware of the Debtor's alleged insolvency.

In sum, applying the five factors set forth above to the facts in the record, as viewed in the light most favorable to the Plaintiff, this court concludes that the Settlement Agreement between Defendant Partnerships and the Debtor was supported by "fair consideration." Accordingly, the Defendant Partnerships are entitled to judgment as a matter of law on the Plaintiff's claims under Sections 4, 5 and 6 of the UFCA. MICH. COMP. LAWS ANN. §§ 566.14–16.

### 2. *Actual Fraud*

In addition to alleging the existence of constructive fraud, Plaintiff also claims that the Settlement Agreement between the Debtor and the Defendant Partnerships was made with the fraudulent intent to hinder, delay or defraud other creditors, and hence, is voidable as a fraudulent conveyance under Section 7 of the UFCA. Section 7 of the UFCA provides:

**566.17 Conveyance made with intent to defraud**

Sec. 7. Every conveyance made and every obligation incurred with actual intent,

as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

MICH. COMP. LAWS ANN. § 566.17.

■ In order to prevail on its claim of actual fraud under Section 7 of the UFCA, the Plaintiff must be able to establish the existence of fraud by "clear and convincing" evidence:

Under Michigan's Fraudulent Conveyance Act, the party alleging fraud must prove the existence of fraud by clear and convincing evidence. *United States v. Rode*, 749 F.Supp. 1483, 1493 (W.D.Mich.1990), *aff'd*, 943 F.2d 53 (6th Cir.1991); see also *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989) (stating that if a party's case requires proof of an element by clear and convincing evidence, then that burden must be met by that party at the summary judgment stage to avoid dismissal).

*City Management Corp. v. U.S. Chemical Co.*, 43 F.3d 244, 254 (6th Cir.1994). It is only in an extraordinary instance when a Debtor will admit that property was conveyed with the intent to hinder, delay or defraud other creditors. The Defendant Partnerships have obtained an affidavit from the Debtor's President in which he swears that "At the time of the settlement of the Clinton County Circuit Court litigation, I did not settle that matter to in any way to [sic] hinder, delay or defraud any of my past, present or future creditors by entering into that settlement." *See* Affidavit of Gordon L. Long (July 20, 1995).

■ Plaintiff characterizes Long's affidavit as "smarmy" and "self-serving." *See* Plaintiff's Brief in Opposition, p. 14. Plaintiff further argues that Long "has amply demonstrated that he is simply unworthy of belief" based in part on the fact that Long had previously cheated his partners who are now parties to the instant suit.[6] In addition to attacking Long's credibility, Plaintiff cites

---

6. "Without any countervailing evidence, either testimonial or documentary, the bankruptcy

cases in which courts have looked to various indicia to determine the existence of fraudulent intent. These so-called "badges of fraud" include:

(1) Relationship between the debtor and the transferee;

(2) Lack of consideration for the conveyance;

(3) The transfer of the debtor's entire estate;

(4) Reservation of benefits, control or dominion by the debtor;

(5) Insolvency or indebtedness of the debtor;

(6) Secrecy or concealment of the transaction; and

(7) Pendency or threat of litigation at the time of the transfer.

*In re Otis & Edwards*, 115 B.R. at 909–10 (citing *In re Steele*, 79 B.R. 503, 504 (Bankr. M.D.Fla.1987)).

### a. *Relationship Between Debtor and Transferee*

As noted above, there was no "love lost" between the Debtor's President, Long, and his former partners whom he cheated out of several million dollars in profits which rightfully belonged to the Defendant Partnerships. This court has previously concluded that the Settlement Agreement was an "arms-length transaction" which followed years of litigation. Under these circumstances, there was no "special relationship" between the parties which would cause the Defendant Partnerships to conspire with the Debtor in order to defraud other creditors.

### b. *Lack of Consideration for the Conveyance*

There is not a scintilla of evidence to the contrary: the release of a liability of at least

$5 million is fair consideration for the payment of approximately $3.1 million in settlement. *See supra.* Moreover, in a very real sense, the Debtor was simply repaying a portion of the profit which rightfully belonged to the Defendant Partnerships in the first place. Thus, the finding of adequate consideration weighs heavily against a finding of actual fraud on the part of either the Debtor or the Defendant Partnerships.

### c. *The Transfer of the Debtor's Entire Estate*

The Settlement Agreement called for the payment of approximately $250,000 in cash, and the assignment of rights to future payments under the Wrap Notes for a total settlement of $3.1 million. Even assuming that this obligation made the Debtor insolvent, the agreed-upon settlement certainly did not constitute the Debtor's "entire estate." As noted by Plaintiff, Debtor possessed substantial assets in real estate as well as the right to future payments owed under the Wrap Notes. Thus, the fact that Debtor did not transfer its entire estate to the Defendants weighs against a finding of actual fraud.

### d. *Reservation of Benefits or Control by the Debtor.*

In his affidavit, Long claimed that he did not "retain any interest in or control over or possession of the portion of the Wrap Notes which were assigned to the Defendant Partnerships." *See* Long Affidavit, p. 4, ¶ 15. Plaintiffs have failed to present *any* evidence which would indicate that either the Debtor or its President, Long, retained any undisclosed interest in the $3.1 million promised to the Defendant Partnerships under the Settlement Agreement.[7] As previously noted, if there were some evidence of hidden consideration or "kickbacks" paid by the Partnerships to Long in order to secure the settlement, then such facts would tend to lend

---

judge [as a fact-finder] was not free to reject [the creditor's] claim out of hand." *Duddy v. Kitchen & Bath Dist. Inc. (In re Scheirich Co.)*, 982 F.2d 945, 950 (6th Cir.1993).

7. The Debtor may ultimately be entitled to receive a residual interest in the Wrap Notes under the settlement in the event the Defendant Partnerships receive full payment and excess proceeds exist.

some support to the conclusion that the settlement constituted a fraudulent conveyance. However, there has been no such evidence presented in this case. Reiterating, the Partnerships were simply seeking to recover a portion of the profit wrongfully misappropriated from them by Long for the benefit of the Debtor.

### e. Insolvency or Indebtedness of the Debtor

For purposes of this motion, it has been assumed that the Debtor was at or near the point of insolvency at the time it entered into the Settlement Agreement with the Defendant Partnerships. This factor would tend to support an inference of fraud. However, it is also undisputed that the Debtor continued operations for nearly three years before it eventually filed for reorganization under chapter 11 of the Bankruptcy Code in August of 1991. Accordingly, even if it is assumed that the Debtor was "technically insolvent" at the time of settlement, the Debtor's financial position was strong enough to avoid bankruptcy for almost three years. Thus, while this factor weighs in favor of the possibility of fraudulent intent, its weight is limited.

### f. Secrecy or Concealment of the Transaction

Of the so-called "badges of fraud", the secrecy issue is the Committee's best argument to support some finding of fraud. It is undisputed that the record of the litigation in Clinton County Circuit Court between the Debtor and the Defendant Partnerships was subsequently sealed at the request of Long. Plaintiff seizes on this fact to argue that the sealing of the record prevented other creditors from learning of the Settlement Agreement and the assignment of rights to payments under the Wrap Notes. In response, Defendant Partnerships contend that the settlement and subsequent assignment were disclosed to some of the Debtor's major creditors including Michigan National Bank and several law firms. See Defendants' Brief in Support of Motion for Summary Judgment, pp. 16–17. See also Long Affidavit, p. 5, ¶ 18.

It appears that a genuine issue of fact exists as to whether or not the creditors were aware of the Settlement Agreement and assignment of rights to proceeds from the Wrap Notes. In viewing the facts in the light most favorable to the nonmoving party, it appears that Long, and the Debtor controlled by Long, attempted to conceal the existence of the Settlement Agreement with the Partnerships from his other creditors. Moreover, it appears that the Defendant Partnerships, either actively or passively, may have aided in this concealment by entering into a confidentiality agreement with the Debtor. Thus, this factor gives the most support to an inference of fraudulent intent on the part of the Debtor and the Defendant Partnerships.

### g. Pendency or Threat of Litigation at Time of the Transfer

Finally, in moving for summary judgment, the Defendant Partnerships have alleged that neither the Debtor, nor Long, were subject to any major litigation which would have influenced the decision to settle the claims brought by the Partnerships in Clinton County Circuit Court. See Defendant's Brief in Support of Motion For Summary Judgment, p. 15. See also Long Affidavit, p. 4, ¶ 17. In response, Plaintiff has provided the court with a copy of an order of judgment in favor of Great Lakes Federal Savings & Loan Association and against the Debtor, Long, and his wife, in the amount of $585,-005.41. The judgment was issued by the Circuit Court for the County of Ingham and is dated December 7, 1988, the same date that the Debtor entered into the Settlement Agreement with the Defendant Partnerships.

Viewing the facts in the light most favorable to the nonmoving party, it can be inferred that the Debtor was motivated to enter into the Settlement Agreement based on the threat of litigation from other creditors, including Great Lakes Federal Savings and Loan. This finding weighs in favor of an inference that the Debtor and its President, Long, may have been attempting to "hinder, delay and defraud" other creditors by settling with the Defendant Partnerships and then attempting to conceal the existence of the settlement.

In sum, Plaintiff has identified three potential badges of fraud: (1) the secrecy of the transaction; (2) the existence of other litigation; and (3) the presumed insolvency of the Debtor. However, the remaining four factors strongly weigh against an inference of fraudulent intent: (1) the adversarial relationship between the Debtor and his former partners; (2) the Debtor did not divest itself of its entire estate; (3) neither the Debtor nor Long retained any interest in the property conveyed under the settlement; and (4) most importantly under the circumstances, the existence of fair consideration to support the payment of the settlement.

When all the factors are weighed together, this court concludes, as any reasonable factfinder must conclude, that the Plaintiff cannot meet its burden of establishing fraudulent intent by "clear and convincing" evidence as required under Michigan law. *See City Management Corp. v. U.S. Chemical Co.*, 43 F.3d 244, 254 (6th Cir.1994) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989) (stating that if a party's case requires proof of an element by clear and convincing evidence, then that burden must be met by that party at the summary judgment stage to avoid dismissal)).[8] Even when the facts are viewed in the light most favorable to the Plaintiff, the Plaintiff has not raised a genuine issue of material fact based upon sufficient "concrete evidence" as to whether or not the Debtor possessed the requisite fraudulent intent necessary to establish a *prima facia* case of fraudulent conveyance under Section 7 of the UFCA. A fair-minded jury would not return a judgment for the Committee on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Accordingly, this court concludes that the Defendant Partnerships are entitled to judgment as a matter of law on the Plaintiff's claims under Section 7 of the UFCA. MICH. COMP. LAWS ANN. §§ 566.17.

## V. CONCLUSION

For the reasons set forth above, the Defendants' Motion for Summary Judgment regarding the remaining counts of the Committee's Amended Complaint is hereby GRANTED. A separate order will be prepared, signed and docketed addressing this motion and the court's prior trial opinion pertaining to Counts I and II of the Committee's Amended Complaint.

8. In its Brief in Opposition, the Committee agreed that clear and convincing evidence is required to prove *actual fraud* under Michigan law. *See* Brief in Opposition, p. 7, n. 3.